UNITED STATES of America

v.

Laura WHITEHORN, Linda Evans, Marilyn Buck, Susan Rosenberg, Timothy Blunk, Alan Berkman, Elizabeth Duke.

Crim. No. 88–0145 (HHG).

United States District Court, District of Columbia.

April 11, 1989.

Rhonda Fields and Margaret Ellen, Asst. U.S. Attys., Washington, D.C., for the U.S.

Nkechi Taifa, Russell Canan, Milliken, Van Susteren & Canan, Daniel Meyers, Bernabei & Katz, Shawn Moore, Public Defender Service, Robert E. Morin, Fisher, Morin & Kagan–Kans and Mary K. O'Melveny, Washington, D.C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

The defendants in this case—Laura Whitehorn, Timothy Blunk, Alan Berkman, Susan Rosenberg, Marilyn Buck, and Linda Evans [1]—stand indicted in this Court of conspiracy [2] and four counts of bombing [3] the United States Capitol, the National War College Building at Fort McNair, the Computer Center at the Washington Navy Yard, and the Officer's Club at the Navy Yard,[4] all in 1983 and 1984.[5] With the exception of Whitehorn,[6] all the defendants

---

**1.** A seventh defendant, Elizabeth Duke, is a fugitive from justice.

**2.** 18 U.S.C. § 371.

**3.** 18 U.S.C. §§ 844(f), 2. As explained more in detail in Part X of this Opinion, three of the defendants are named in the conspiracy count only as unindicted co-conspirators.

**4.** Four additional bombings—of the Federal Building on Staten Island, the South African consulate, the Israeli Aircraft Industries Building, and the Patrolmen's Benevolent Association

Building, all in New York City—are alleged in the conspiracy count.

**5.** The last of the fugitive defendants was arrested on May 23, 1985. For an account of the post-arrest, preindictment delay, see Part I–A, infra.

**6.** In 1986, Laura Whitehorn pleaded guilty in the Southern District of New York to filing a false passport application. She was sentenced to two years imprisonment on February 19, 1987, and was paroled on February 19, 1988.

have previously been convicted in other federal courts of such crimes as conspiracy and illegal possession of firearms and explosives, and one of them, Buck, was earlier convicted of armed robbery and bank robbery killing in connection with the robbery of a Brinks armored car in Nanuet, New York. Again, all defendants but Whitehorn are now serving substantial sentences with respect to these offenses.[7]

The defendants[8] filed a considerable number of pretrial motions, and following the filing of oppositions by the government and of defendants' replies, the Court heard oral argument on many of these motions for two days on March 16 and 17, 1989. Additional hearings—on motions requiring the consideration of evidence in addition to legal argument (*e.g.*, motions to suppress) —will be held within the next two weeks.

In this Opinion, the Court disposes of the pending motions as follows. The first two sections deal with defendants' challenge to the entire prosecution—Prosecutorial Misconduct (Part I), and Vagueness (Part II). This is followed by five sections on procedural claims and requests—Surplusage and Bill of Particulars (Part III); Witness and Evidence Lists (Part IV); Severance (Part V): Grand Jury Minutes (Part VI); and Exculpatory Evidence (Part VII); next is a motion on Courtroom Security (Part VIII); and the final two sections discuss motions filed on behalf of only some defendants— Dismissal of Conspiracy Count (Part IX) and Double Jeopardy (Part X).

As will be seen below, and for the reasons there stated, all but one of the motions will be denied in whole or in part. The one motion the Court is granting is that which claims double jeopardy, and the indictment will be dismissed on that basis as to the three defendants (Timothy Blunk, Alan Berkman, and Susan Rosenberg) who were placed in jeopardy by their prior crim-

inal trials and convictions based on the same evidence as that which the government expects to use in their trial on the current indictment in this Court. Part X of this Opinion discusses that double jeopardy issue.

I

## Prosecutorial Misconduct

Initially, the defendants challenge the basic validity of the indictment in three related motions to dismiss based on claimed governmental misconduct. One of these is a joint motion of all defendants for a dismissal on account of unconstitutional delay and prosecutorial vindictiveness. In addition, defendant Rosenberg filed her own motion to dismiss because of alleged prosecutorial vindictiveness. Finally, the defendants filed a joint motion to dismiss which alleges far-ranging prosecutorial misconduct and encompasses the allegations in the other two motions. Since the Court has determined that the indictment must be dismissed as to defendant Rosenberg based on double jeopardy considerations, it will not specifically address the issues raised in her motion. Instead it will consider the specific claims of unconstitutional delay and prosecutorial vindictiveness before moving to the defendants' umbrella motion regarding misconduct.

### A. *Delay*

■ Under the Due Process Clause of the Fifth Amendment, a defendant is protected in the federal courts against oppressive pre-indictment delay. *United States v. Marion,* 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). The Supreme Court has established a two-part test for determining whether an indictment should be dismissed on account of such delay: (1) the delay must have caused substantial

---

7. Defendant Whitehorn is under indictment in the District Court for the District of Maryland for one count of possession of false document-making implements, one count of possession with intent to use unlawfully false identification documents, both in violation of 18 U.S.C. § 1028, and one count of forcibly resisting arrest, in violation of 18 U.S.C. § 111.

8. When this Opinion refers to "defendants," this usually means or includes defendants' counsel; similarly, when reference is made to the "government," this usually refers to the prosecutors but, depending on the context, it may also be taken to refer to other agencies of government.

prejudice to the defendant's right to a fair trial; and (2) the delay must be the result of an intentional effort by the prosecutor to gain a tactical advantage over the defendant. *Marion,* 404 U.S. at 324, 92 S.Ct. at 465. The defendants assert that the three-year delay in this case between arrest and indictment satisfies that test.

There is little doubt that the defendants have suffered some prejudice as a result of the government's delay in bringing the indictment. It is likely, for example, that the delay preceding the indictment in this case, combined with defendants' trials in other courts, has strained their emotional and financial resources. Whatever prejudice they may have suffered, however, is not nearly as great as they claim.

The most substantial prejudice resulting from the delay in this case, it is said, has been to defendants' ability to defend against the government's charges. More specifically, defendants state that because of the delay, they "are faced with the almost impossible task of trying to reconstruct their whereabouts, locate witnesses and documents and prepare a defense to events which occurred years ago." [9] Were this true, this would be precisely the type of prejudice that is relevant in the post-indictment Sixth Amendment context, and it would be an important due process consideration as well. *See Smith v. Hooey,* 393 U.S. 374, 380, 89 S.Ct. 575, 578, 21 L.Ed.2d 607 (1969).

However, the possibility of prejudice [10] is contradicted by the factual picture, for the delay in bringing the indictment in this case has not, as a practical matter, increased the defendants' difficulty in preparing for trial even close to the level of "near impossibility" that they allege. As the defendants themselves repeatedly emphasize (even in the instant motion), several

of them have spent much of the last three years in trials involving many of the same issues, evidence, and witnesses as are presented in the instant case.

The blunt fact is that, because of their incarceration, the defendants have apparently been able to do little else in the last three years other than to participate in trials concerning the events surrounding the alleged bombings or to prepare for such trials. The contention that they have lost track of witnesses or are unable to reconstruct events that happened in the past therefore strains credulity, and the Court is not persuaded that the delay has caused any significant prejudice to their ability to defend against the charges in the indictment here.

Moving to the second part of the test for unconstitutional delay, the Court concludes that the government did not purposely delay the return of the indictment to gain a tactical advantage. In this Circuit, a defendant who is challenging the delay has the burden of showing that the government acted for improper purposes. *United States v. Pollack,* 534 F.2d 964 (D.C.Cir. 1976).[11] Defendants assert that "there can be no legitimate reason for the delay ..." and that the indictment was brought when it was only to hold a club over their heads.[12] That contention, too, is patently erroneous.

The government offers several legitimate reasons for the delay. First, it points to a change in prosecutors and the resulting need, for at least a limited period of time, to review the files and to prepare for judicial proceedings. While such a delay is permissible,[13] it certainly does not fully explain or justify the three years that preceded this indictment.

More importantly, the government maintains that the delay was necessary to re-

---

9. Motion at 14.

10. At best, defendants assert only a mere possibility that witnesses will be lost or events will be forgotten, and this is not sufficient to warrant a dismissal of the indictment on due process grounds. *Marion,* 404 U.S. at 325–26, 92 S.Ct. at 466.

11. *But see, United States v. King,* 593 F.2d 269, 272 (7th Cir.1979). The Court's conclusion would not be altered even if the burden were on the government.

12. Motion at 15.

13. *See United States v. Automated Medical Laboratories,* 770 F.2d 399, 404 (4th Cir.1985).

solve questions about the admissibility of crucial evidence. In the case against Laura Whitehorn in the District of Maryland, the District Court initially suppressed much of the evidence, seized from a Baltimore apartment, that the government intended to introduce there as well as here. That suppression order was reversed by the Court of Appeals for the Fourth Circuit,[14] and the basis of that reversal was ultimately argued before the Supreme Court in the parallel case of *Murray v. United States*, — U.S. —, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Because the prosecutors in the present case decided that admission of the evidence from the Baltimore apartment was essential to the instant prosecution,[15] they attempted to wait until the Supreme Court rendered its decision in *Murray*.

However, when the statute of limitations was about to run in the instant case, and the Supreme Court had not yet issued its *Murray* ruling, the government finally asked the grand jury in this district to return the present indictment, and that indictment was, in fact, returned on April 20, 1988.

Then a further complication ensued. Because the armed robbery and conspiracy trial of Marilyn Buck was about to conclude just then in the Southern District of New York, the government requested that the indictment here be sealed to avoid any publicity that could affect the jury in that case, and the Court complied. On the day defendant Buck was convicted in New York, and the danger of prejudice had passed, the government requested that the indictment here be unsealed, and that was done.[16]

The Supreme Court has recognized that it is proper for a prosecutor to delay seeking an indictment until he is satisfied that he will be able to establish the defendant's guilt beyond a reasonable doubt. *United States v. Lovasco*, 431 U.S. 783, 791, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977).[17] The government asserts that without the evidence from the Baltimore search, its efforts to prosecute this case would have been hampered so severely that it would most likely have abandoned the prosecution.[18]

Under these circumstances, the decision to attempt to await the Supreme Court's decision was reasonable and in the interest of the sound administration of justice. *See United States v. Stewart*, 426 F.Supp. 58, 60 (E.D.Mich.1976). The Court regards the government's actions as responsible, and it concludes that there is no basis for a finding of a purpose to gain an improper tactical advantage.

### B. *Vindictiveness*

■ The defendants next claim that the indictment should be dismissed because the government brought this indictment to harass and punish them for the exercise of their First Amendment rights. Clearly an indictment brought for such vindictive purposes would be inconsistent with the government's obligations under law and would properly be dismissed. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974). *Blackledge*, however, creates a presumption of an improper motive on the part of the prosecutor only in cases in which a "reasonable likelihood" of vindictiveness exists. *United States v. Goodwin*, 457 U.S. 368, 373, 102 S.Ct. 2485, 2489, 73 L.Ed.2d 74 (1982). No such likelihood is apparent here.

Defendants allege that a strong likelihood of prosecutorial vindictiveness is evi-

---

14. *See* note 41, *infra.*

15. Government's Opposition at 8.

16. *See generally,* Government argument at motions hearing, March 16, 1989.

17. As the Court there said, to impose a duty on prosecutors to file charges before they are satisfied that they will be able to establish the suspect's guilt beyond a reasonable doubt would have a deleterious effect on potential defendants (likelihood of having to face unwarranted charges), on law enforcement officials (making proof of guilt sometimes impossible by causing potentially fruitful sources of information to evaporate), and on the courts (consumption of scarce resources by insubstantial cases). 431 U.S. at 791–92, 97 S.Ct. at 2049.

18. Government's Opposition at 8.

denced by the fact that the government brought successive prosecutions in this case, combined with defendants' outspoken opposition to the policies of the United States government. According to the defendants:

> All these factors indicate that the defendants are being "unrelentingly" prosecuted because of their beliefs; their political activities and their resolve to maintain those beliefs.[19]

This claim—that they are being prosecuted and punished for their political beliefs and activities—runs like a bright thread through almost all of the defendants' motions and supporting papers. None of those assertions, no matter how often repeated, can obscure the fact, however, that the defendants are being prosecuted for bombing the United States Capitol, the National War College Building at Fort McNair, the Computer Center at the Washington Navy Yard, and the Officer's Club at the Washington Navy Yard, or that the conspiracy count further alleges that they also bombed the Federal Building on Staten Island, the South African Consulate, the Israeli Aircraft Industries Building, and the Patrolmen's Benevolent Association Building, all in New York. None of these acts falls into the category of "beliefs" or "political activities."[20]

Bombings are violent acts, and defendants have no immunity from prosecution for such acts merely because they also hold protected beliefs or, for that matter, because they hold beliefs that may be abhorrent to the government and to many citizens. This proposition can easily be tested. Suppose that one of these particular defendants had been arrested in the act of selling illegal drugs or of robbing a liquor store. Could it reasonably be maintained that he could not legally be prosecuted by the government for these offenses on the basis that he is not popular with that government? Of course not. Prosecutorial vindictiveness cannot be inferred from the fact that the prosecutors are deter-

mined to bring to justice those who, they have reasonable cause to believe, have engaged in a series of bombings. Prosecutors are presumably equally determined—and properly so—to bring to justice other individuals who commit other serious crimes. Prosecutors are expected to be unsympathetic to lawbreakers, as are most law-abiding citizens.

In support of their motion, defendants rely on numerous cases involving decisions by prosecutors to increase or to multiply charges against a defendant following his exercise of a procedural due process right, such as the right to an appeal, the right to transfer venue, or the right to refuse a trial before a magistrate. *See, e.g., United States v. DeMarco,* 550 F.2d 1224 (9th Cir. 1977); *United States v. Johnson,* 537 F.2d 1170 (4th Cir.1976); *United States v. Ruesga–Martinez,* 534 F.2d 1367 (9th Cir.1976).

The application of these cases to the issue here is doubtful because defendants are not asserting that the government brought this indictment to retaliate for their exercise of such a specific procedural right. Their theory is far more amorphous: they claim that charges are being brought against them on account of their general political orientation—a matter that would be far more difficult to prove or disprove.

In any event, it is not necessary for the Court to pursue that line of inquiry, for it is plain that these defendants are not being prosecuted on an imaginary or chimerical theory for acts which either do not normally constitute crimes or constitute protected conduct of some sort. They are being prosecuted for allegedly engaging in conduct which any reasonable person would regard as criminal: four bombings in New York, and four more bombings of as many different buildings in the District of Columbia, one of them being the United States Capitol, the seat of this nation's legislature.

There is not the slightest support in the law for the proposition that these defen-

---

**19.** Motion at 19.

**20.** It may well be that, from defendants' point of view, any bombings they might have perpetrat-

ed were political statements or activities. That is not so, however, from the point of view of the law.

dants or any others may not be prosecuted for the commission of such violent acts because they may have been motivated by "political" opposition to the nation's government, or that a prosecution for such crimes is, somehow, improper. To the contrary, absent unusual circumstances, the Executive authorities would be acting aberrantly if they did not prosecute those who committed such crimes. For these reasons, the Court rejects the prosecutorial vindictiveness contention.

### C. Prosecutorial Misconduct—General

■ Defendants claim next that the delay and the alleged prosecutorial vindictiveness discussed above should be viewed in the context of what they assert to be overarching government misconduct in this case, and they assert that the totality of the misconduct is so great that it warrants dismissal of the indictment under the Court's supervisory powers.

The courts have recognized that, in rare and extreme cases of government misconduct with respect to a defendant, "in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction," a court may find it necessary to dismiss the indictment. *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973).[21] However, most of the defendants' charges need not be evaluated under the *Russell* standard because they do not involve the investigation and prosecution of this case; rather, they represent unrelated complaints

by the defendants against various government policies and conduct.

First. Many of defendants' claims, whether substantively justified or not, are entirely irrelevant to the instant case.[22] For example, their memorandum describes at great length and in considerable detail the defendants' view that the United States is or has been guilty of "war crimes" in such places as Nicaragua, Grenada, Puerto Rico, South Africa, Israel, Lebanon, and several other countries, as well as against American Indians.[23] The government's activities in all of these places are, of course, entirely unrelated to its investigation of these defendants, and they have nothing to do with the prosecution's effort to secure convictions here.

Even assuming that United States policy with respect to these and other countries is wrong, misguided, or even violative of international law—which the Court will do only for the purpose of passing on defendants' claims—that obviously does not give defendants a license to blow up buildings in the District of Columbia or elsewhere. Whatever they may wish to believe, these defendants are not the judges of United States policy or actions, with a mandate to punish the government if it acts in a manner that defendants think is wrong. The judges of that policy and of those actions are the American people at election time.

Alternatively, it may be defendants' point that these policies are relevant to this prosecution on the basis that they are being prosecuted for their opposition to them. However, there are thousands, if not millions, of citizens who are opposed to one such policy or another,[24] and obviously those individuals have not been and will not

**21.** In *Russell*, an entrapment case, the Supreme Court declined to dismiss the indictment.

**22.** In spite of the obvious irrelevance of most of this material, the Court has considered all of it, seeking to extract kernels of relevant and material matter. To some degree, it has succeeded in this endeavor. *See, e.g.,* Part I–D, *infra*.

**23.** The lengths to which defendants go in this regard are exemplified by the memorandum section on the Mexico/Chicano people which begins by complaining that the "US government conquered northern Mexico by force and has

illegally occupied this territory since 1868." Memorandum at 49. Other sections, arranged by continents and regions, include among alleged United States "war crimes" such matters as the involvement of the United States in El Salvador's civil war, its maintenance of a policy of "constructive engagement" in South Africa, and its continuing role in Puerto Rico.

**24.** Even in the United States Capitol, which defendants allegedly bombed, there are many opponents of some or all of these policies.

be prosecuted on that account. The supposition that these defendants represent such a danger to United States "imperialist" designs that criminal prosecutions against them had to be manufactured, or that it became necessary otherwise to harass or intimidate them merely to silence them, is to assign to defendants roles for which they are unsuited. At the risk of repetition, the Court will note once again that, if the government's evidence matches its allegations, the defendants have committed real, live, concrete crimes which are subject to punishment under the standards of any civilized society.

Second. Defendants' memorandum in support of their motion next describes the FBI's counterintelligence neutralization program (COINTELPRO) activities in the 1960s and 1970s,[25] and alleged illegalities in connection with the investigation of the Brinks armored truck robbery of which defendant Buck was convicted in an earlier case. The Court could not reasonably conclude that FBI investigations, of defendants and others, conducted in the 1960s and 1970s—many years before the bombings at issue in this case occurred and of course many years before the investigation and indictment in this case—were intended to secure defendants' conviction under that indictment, or that they would prejudice defendants in this trial. Relatively ancient

governmental misconduct does not immunize defendants from prosecution for illegal acts committed long after that misconduct occurred.[26]

Third. Much of the alleged government misconduct was committed against persons and organizations other than the defendants themselves or the Armed Resistance Unit (ARU), the Revolutionary Fighting Group (RFG), and the Red Guerilla Resistance (RGR), with which these defendants were allegedly affiliated at the time of the bombings.[27] For example, defendants condemn the FBI's investigation of CISPES, the May 19th Communist Organization, and the John Brown Anti–Klan Committee, asserting that both the general investigations of these groups, and specific investigations in connection with the bombings charged in the instant indictment, were illegal [28] and unwarranted.[29]

It is elementary, however, that in a criminal trial defendants have standing to complain about constitutional or other violations only if these violations affect them or their own rights. These defendants may have supported the policies of one or more of these organizations, but they do not assert that they are or were members at the time of the alleged searches, and they therefore cannot seek to vindicate in this proceeding the rights of these groups or of those individuals who were members. In

**25.** Among the illegal activities of COINTELPRO so described are alleged efforts to disrupt and discredit the Black Liberation Movement, efforts to disrupt the Black Panther Party in the late 1960s, "smear" campaigns directed against the "new left," and illegal surveillance of individuals associated with the Weatherman organization in the 1970s.

**26.** This same reasoning applies also to the more recent misconduct alleged to have occurred in connection with the Brinks investigation. According to the defendants, evidence was introduced at Marilyn Buck's trial for that conspiracy that could only have been obtained by an FBI burglary of the apartment of Alan Berkman's wife, Dr. Barbara Zeller. If this is true, it would certainly constitute serious misconduct. Nonetheless, it was unrelated to the investigation of this case; the alleged burglary preceded the bombings charged in this case by over one year; and according to the United States Attorney's Office, evidence there obtained will not be introduced in this trial. Motions hearing,

March 17, 1989. Thus, not only is there an absence of defendant standing but, again, this past governmental misconduct, if it occurred, does not insulate them from prosecution for subsequent criminal acts.

**27.** The defendants allegedly issued communiques in the names of these three groups claiming credit for different bombings.

**28.** The investigations are claimed to have included burglaries of the offices of these various organizations.

**29.** Elsewhere, defendants assert that the FBI carried out a raid of the "Madame Binh Graphics Collective" in Brooklyn, and they go on to say that the Bureau did "not obtain any information related to alleged criminal activity," but only "political literature and art work." Defendants' Reply at 6. What the Madame Binh Collective has to do with the issues in this case is baffling, particularly if no information relevant to criminal activity was recovered.

fact, the defendants do not, and evidently cannot, assert that they were surveilled or harassed in the course of the government's investigation of these organizations, or that evidence to be used against them in the forthcoming trial was secured in the course of alleged governmental activities. That being so, they cannot rely on the alleged misconduct to defeat their own prosecution in this case.

Defendants' point that the "illegal investigations of CISPES, May 19th Communist Organization, and the John Brown Anti–Klan Committee are woven into the very fabric of the current case" [30] is a generalized assertion without meaning, particularly in terms of the standing of these defendants to complain about injury to others— an issue that is critical in this context. Defendants respond that standing is not necessary because theirs is a due process claim. Assuming that the investigations of the groups listed by defendants were sufficiently outrageous to offend standards of decency and fairness,[31] "the fact remains that '[t]he limitations of the Due Process Clause ... come into play only when the Government activity in question violates some protected right of the *defendant.*'" *United States v. Payner*, 447 U.S. 727, 737 n. 9, 100 S.Ct. 2439, 2447 n. 9, 65 L.Ed.2d 468 (1980) (*quoting Hampton v. United States*, 425 U.S. 484, 490, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113 (1976)) (emphasis in original).

The short of it is that defendants do not have the generalized right they assert to ensure that the rights of others are not violated. If an illegal activity infringes on their constitutional rights or otherwise protected civil liberties, the Court can and will provide a remedy. However, the Supreme Court has made it clear that if the activity violates the rights of others, even if they be "friends, families, and political associates," [32] it is they who must assert the injury, not the defendant in a criminal case or some other third party. *Payner*, 447 U.S. at 737 n. 9, 100 S.Ct. at 2447 n. 9. On this basis, then, defendants' allegations that the rights of others were violated, even if true, would not justify a dismissal of the indictment.[33]

### D. *Specific Prosecutorial Misconduct*

Defendants' only assertions of government conduct relating to their own rights in relation to this investigation and prosecution are claims of (1) excessive sentences, (2) oppressive prison conditions,[34] (3) improper electronic surveillance, and (4) an illegal search of the Alameda apartment in Baltimore. The test for evaluating such claims, according to *United States v. Russell, supra*, 411 U.S. at 432, 93 S.Ct. at 1643, is whether the government's actions violate "fundamental fairness, shocking to the universal sense of justice." [35]

**30.** Motion at 40.

**31.** Burglaries committed by police or investigative agencies whose function it is to protect citizens against crime, not to commit it themselves, might well qualify. *See United States v. Russo*, Criminal No. 9373 (C.D.Cal.1973) (dismissal of Ellsberg–Russo indictment) [*cited* in *United States v. McCord*, 509 F.2d 334 (D.C.Cir. 1974)]).

**32.** Defendants' Reply at 16.

**33.** In their motion (pp. 78–81), defendants cite numerous cases in which courts have relied on their supervisory power to dismiss indictments. Not one of the cases involved misconduct with respect to parties other than the defendants or misconduct that took place before the crimes charged in the indictment were committed. In fact, almost every case involved either entrapment or prosecutorial misconduct before the

grand jury or during the trial. *See, e.g., United States v. Hogan*, 712 F.2d 757 (2d Cir.1983) (indictment dismissed because of inflammatory and false statements before grand jury); *United States v. Kelly*, 707 F.2d 1460 (D.C.Cir.1983) (indictment not dismissed despite claim of entrapment); *United States v. Lawson*, 502 F.Supp. 158 (D.Md.1980) (indictment dismissed because prosecutor asked misleading questions before grand jury and did not introduce exculpatory evidence). On this basis, too, defendants' claim is therefore not well taken.

**34.** In this connection, defendants also complain of prejudicial trial conditions stemming from the security measures with respect to the courtroom. That subject is discussed in Part VIII, *infra.*

**35.** That is the test applied for a dismissal of the indictment. The standard for the suppression of evidence, *e.g.*, under the Fourth Amendment, is less onerous.

■ First. The argument that the government acted vindictively by requesting disproportionately long sentences fails on a number of grounds. The sentences in the New Jersey case against Blunk and Rosenberg were imposed by Judge Frederick B. Lacey, not by the Department of Justice or the Federal Bureau of Investigation. Unless one were to assume that the judge, too was part of the conspiracy against defendants that they postulate,[36] the sentences he imposed must be regarded as merely the expression of his judgment as to what was warranted under the circumstances. Beyond that, the Court of Appeals for the Third Circuit examined the 58–year sentences imposed upon these two defendants, and it upheld them against a number of challenges, including the charge that they were motivated by retaliation for defendants' political philosophy. *United States v. Rosenberg*, 806 F.2d 1169, 1176–80 (3rd Cir.1986).

■ Second. Defendants fare no better on their claims of improper prison conditions.[37] This Court has previously considered and investigated the conditions of defendants' confinement at the D.C. Jail, ordered a number of modifications,[38] and approved them as so modified. Contrary to defendants' assertion that they are being held at that facility in restrictive conditions of confinement because of their political beliefs, these conditions are warranted under the general standards of the U.S. Bureau of Prisons and the D.C. Department of Corrections because of defendants' history of fugitivity and the involvement of some of them in escapes. *See* the Court's

Memorandum and Order of September 6, 1988.

Here, too, defendants seek to transform their political beliefs from a shield into a sword. The defendants have a right not to be treated more restrictively than other inmates on account of those beliefs. At the same time, those beliefs do not entitle them to special preferential status when security measures are applied to them as to others with similar records evidencing actual or potential fugitivity. *See* Part VIII, *infra.*

■ Third. Defendants maintain next that the government is guilty of misconduct in that it used illegal electronic surveillance in the course of its investigation of them. Indeed, they claim that the government falsely made several denials— that it used a trap and trace (or possibly even a wiretap) on the telephone of the Alameda apartment occupied by several of the defendants in Baltimore, and that it had monitored a conversation between one Brian Harrigan and defendant Evans. While defendants concede that consensual monitoring is not illegal,[39] and that traps and traces did not require a court order in 1985, they assert that these instances indicate (in the face of previous governmental denials regarding such practices) that deception exists regarding wiretapping in this case, and they seek to explore, in an evidentiary hearing, the full extent of their electronic surveillance by the police.

Such a hearing is not necessary, at least not at this time. The Court has ordered the government to produce Elsur indices

---

**36.** Even the defendants do not make that claim.

**37.** Defendant Rosenberg prevailed in a lawsuit which challenged the conditions at FCI Lexington where she was previously held, not at the D.C. Jail where the defendants have been detained during the pendency of the criminal prosecution here. Because the indictment against Ms. Rosenberg is being dismissed for other reasons (*see* Part X, *infra*), and her Lexington confinement is over, it is not necessary, or even appropriate, to consider further the conditions of that confinement.

**38.** Memoranda and Orders of the Court dated June 8, 1988, and September 6, 1988. Briefly,

the Court ordered that all defendants and their counsel be permitted to meet jointly; that during counsel meetings the shackles otherwise required by the correctional authorities be removed; that paralegals as well as attorneys be allowed visits at the jail; that all meetings with counsel be private; that the defendants be allowed to take legal materials from the meeting room to their cells; and that the hours when defendants could be out of their individual cells be extended. The Court also ordered that Ms. Whitehorn be released to the general D.C. Jail population.

**39.** It appears that Harrigan consented to the monitoring.

and affidavits [40] regarding all electronic surveillance conducted of any of these defendants. If those indices indicate illegal government surveillance of the defendants in connection with this indictment, the Court will take further appropriate action. Similarly, if there are inconsistencies between the government's indices and the defendants' information regarding electronic surveillance, the Court will consider what action is appropriate, depending upon the apparent reliability of the information produced by the two sides.

▮ Fourth. Finally, defendants assert that the government's misconduct in its search of the Alameda apartment in Baltimore was so serious that it goes beyond a mere Fourth Amendment violation and the need for the suppression of the evidence and warrants the use of the Court's supervisory power to dismiss the indictment.

A legitimate question exists regarding the legality of the Baltimore search and the use of evidence discovered in its course. Judge Norman P. Ramsay of the District Court for the District of Maryland conducted a full hearing on this issue in the context of the Baltimore indictment of defendant Whitehorn. Following the hearing, Judge Ramsay found that the bomb sweep then conducted was illegal, and he suppressed the evidence discovered during that sweep. However, that decision was reversed by the Court of Appeals for the Fourth Circuit [41] based on reasoning that

was later sustained by the Supreme Court in *Murray, supra.*[42] There is no basis for a decision by this Court holding that conduct which was found by the Courts of Appeals for the Fourth and the Second Circuits [43] not to warrant suppression of the seized evidence is so outrageously offensive that it warrants dismissal of this prosecution under the Court's supervisory power.

Defendants assert that they have evidence of misconduct that was not presented to Judge Ramsay. While defendants are entitled to a hearing on new evidence regarding this issue, it is not clear, based on the defendants' characterization of the new evidence and the opinions of the two Courts of Appeals that have considered this question, that the evidence actually is new.

Nevertheless, defendants will be given a focused opportunity to present new evidence or arguments regarding the search of the Alameda apartment at the suppression hearing regarding this search scheduled for the "second round" of motions hearings later this month. This hearing will be, first and foremost, a hearing on the Fourth Amendment issues. Following the hearing, the Court will determine whether there is any evidence that would justify a departure from the decisions of the Fourth and Second Circuits regarding this very search and seizure. In the event, and only in the event, that the Court does find a Fourth Amendment violation that warrants

---

**40.** Elsur (electronic surveillance) indices are records of all electronic surveillance of all individuals who have been targets of surveillance. They are maintained in FBI files and in the files of other agencies. *See Biberman v. FBI,* 528 F.Supp. 1140, 1144 n. 3 (S.D.N.Y.1982); *United States v. Sullivan,* 586 F.Supp. 1314, 1317 (D.Mass.1984). The Court earlier directed the government to search the files of the relevant offices of the FBI, the Anti–Terrorist Task Force, the Secret Service, the Federal Bureau of Prisons, and the intelligence agencies, and to submit proper affidavits by persons with actual knowledge of the searches, stating whether or not electronic surveillance was directed against defendants or their attorneys. The searches are to date back to 1977. Memorandum and Order of February 16, 1989.

**41.** *United States v. Whitehorn,* 813 F.2d 646 (4th Cir.1987).

**42.** The reasoning of *Murray* and of the Fourth Circuit in *Whitehorn* was that evidence discovered during an illegal, warrantless search may still be introduced at trial if it would inevitably have been discovered subsequently pursuant to a valid search warrant. The Court of Appeals for the Fourth Circuit found that, because there was probable cause for a search warrant and because a valid search warrant was properly issued subsequent to the illegal bomb sweep, all of the evidence discovered during the bomb sweep was admissible under the inevitable discovery rule.

**43.** The Court of Appeals for the Second Circuit agreed with the Fourth Circuit decision. *United States v. Whitehorn,* 829 F.2d 1225, 1231 (2d Cir.1987).

suppression of the evidence, will it consider whether the search itself or the government conduct surrounding it is so heinous or outrageous that it warrants dismissal of the entire indictment.[44]

With the exceptions noted, the motions for dismissal on grounds of unconstitutional delay, prosecutorial vindictiveness, and prosecutorial misconduct will be denied.

## II

### *Vagueness*

■ The defendants have next moved to dismiss the indictment on the ground of impermissible vagueness, pointing to various alleged failings in the indictment. These will now be considered seriatim.

First. Defendants maintain that the conspiracy count does not allege the requisite agreement as to the manner and means, but that claim has no merit. Paragraph A of Count One clearly states that the defendants "did willfully and knowingly combine, conspire, confederate, and *agree ...* to commit offenses against the United States...." The conspiracy count then goes on to specify the goal of conspiracy, the manner and means used, and specific overt acts committed by specific defendants in furtherance of the conspiracy. Thus, the language of Count One contains a sufficient allegation that the defendants agreed to the same type of conduct. *Hamling v. United States*, 418 U.S. 87, 117–18, 94 S.Ct. 2887, 2907–08, 41 L.Ed.2d 590 (1974).

Second. Defendants contend that the manner and means section is impermissibly vague in that (1) it alleges only "generic" acts and (2) it does not indicate which defendant or defendants employed the manner and means described. In fact, however, the manner and means listed in the indictment are more than specific enough to inform the defendants of the charges against which they must defend. For example, paragraph eight of the manner and

means section states that the "defendants and co-conspirators, using [certain specific] organizational names ..., would place and explode bombs at various locations including ...," and it then goes on to list eight different bombings, the dates on which they occurred, and the organizations that claimed responsibility for them. Similarly, paragraph fifteen states that the defendants possessed alias identification documents, and it lists the aliases used by each defendant corresponding to the particular documents. And paragraph sixteen states that

> The defendants and co-conspirators would obtain and possess ammunition, bulletproof body armor, firearm accessories, and firearms, including UZI rifles, shotguns, handguns and silencers.

In sum, the conspiracy count sets out with great specificity the acts allegedly committed by the defendants. Because the defendants are charged with conspiracy, it is not necessary that the government specify which defendant is responsible for which acts—if an agreement is shown, co-conspirators are equally responsible for all acts committed in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 646–47, 66 S.Ct. 1180, 1183–84, 90 L.Ed. 1489 (1946).

Defendants maintain also that the government's failure to specify which of them was involved in each of the manner and means, or to allege that all defendants agreed to all manner and means, is particularly problematic in this case because the goal of the conspiracy "squarely implicates the Defendants' First Amendment guarantees to express opposition to policies of the United States." [45] In support of this argument, they rely on *United States v. Peraino*, 645 F.2d 548, 551–52 (6th Cir.1981), and *Castro v. Superior Court*, 9 Cal.App.3d 675, 88 Cal.Rptr. 500 (1970), both of which hold that there is a higher standard for proving a conspiratorial agreement when

---

**44.** The Court will not hold the open-ended hearings requested by defendants to investigate FBI conduct and that of other government agencies which are not directly related to these defendants or material to the issues in this case.

**45.** Motion at 6.

defendants are involved in the exercise of First Amendment rights.[46]

As the Court has had to remind defendants again and again, the goal of the conspiracy, according to the indictment, was not simply to advocate changes in government policy, but to do so by "violent and illegal means." There is no First Amendment right to blow up government buildings, irrespective of the perpetrator's motive. If anything, the *Castro* and *Peraino* decisions support that conclusion.

In *Castro*, the court noted that a demonstration is a legitimate exercise of First Amendment rights, but it further emphasized that "this does not, of course, clothe petitioners with immunity from prosecution for violations of laws which the state may legitimately enforce, even against those who are exercising such rights." 88 Cal. Rptr. at 506. Similarly, in *Peraino*, an obscenity case, the Court of Appeals said that an agreement to distribute materials which constitute expression "may have both legal and illegal purposes depending on varying community standards." 645 F.2d at 551–52. Terrorism and bombings do not constitute protected expression, and they are illegal in every community.

Third. Defendants maintain further that the substantive counts should be dismissed as vague because they do not inform the defendants of their alleged participation in the offenses. The face of the indictment reveals that all the defendants are charged under the aider and abettor statute, 18 U.S.C. § 2, and defendants therefore have notice that the government is proceeding under that theory. In that context, the claim that the indictment is fatally flawed because it does not specify the precise nature of each defendant's involvement is quite simply "devoid of merit." *Pollack, supra,* 534 F.2d at 971.

Moreover, the language of the substantive counts closely tracks the statutory language of 18 U.S.C. § 844(f). "Ordinarily, it is proper for an indictment to be drawn in the language of the statute." *United States v. Nance,* 533 F.2d 699, 701 (D.C.Cir. 1976). To be sure, where the language of the statute is too generic to inform a defendant of the nature of the charges against him, more specificity is required. *Id.; see also, United States v. Thomas,* 444 F.2d 919 (D.C.Cir.1971). However, the indictment satisfies these standards by specifying the dates of the bombings, the buildings bombed, and the agencies of the United States that owned or used them. No more is necessary.

Fourth. An indictment must inform a defendant of the elements of the offense and the charges against which he must defend, and it must enable him to plead double jeopardy as a bar to future prosecutions for the same offenses. *Hamling, supra,* 418 U.S. at 117–18, 94 S.Ct. at 2907–08. As indicated above, the indictment in this case is extremely specific and detailed, and it satisfies all of the requirements of *Hamling.*

What the indictment does not do, as defendants correctly point out, is identify the specific policies of the United States the defendants sought to change. These policies, however, are referred to in the indictment only to describe the goal of the conspiracy; they are not essential elements of the crime charged. As defendants repeatedly and properly emphasize, it is not illegal to disagree with or to attempt to change government policies. *See Noto v. United States,* 367 U.S. 290, 297–98, 81 S.Ct. 1517, 1520–21, 6 L.Ed.2d 836 (1961).[47] What is illegal is to do so by violent means. Thus, the failure of the indictment to list the policies the defendants sought to change is immaterial:[48] defendants are ful-

---

**46.** The cited cases deal with proof at trial, not with the sufficiency of the indictment, and their applicability here is marginal at best. Sufficiency of proof at trial is an important, but unrelated question.

**47.** If the policies were mentioned in the indictment, defendants would certainly be before the Court with long, passionate papers claiming that

such mention proved that the government's purpose is to punish them for their political policy disagreements with the government.

**48.** It matters not, in an indictment charging conspiracy and the bombing of government buildings, whether the policies sought to be changed thereby are the government's policies toward Nicaragua, gun control, abortion, or any

ly informed as to the offenses against which they must defend, and the vagueness motion will be denied.

### III

*Surplusage and Bill of Particulars*

#### A. *General Language*

■ The defendants have moved to strike from the indictment, and more particularly from the explication of the manner and means by which the goals of the alleged conspiracy were to be achieved, and from the listing of the overt acts in furtherance of the conspiracy, such language as "among others," "but not limited to" and "in part." [49] In support of the motion, they argue that these terms erroneously and improperly suggest to the jury that they are charged with offenses and conduct in addition to those actually listed in the indictment. The government responds that most of the language about which the defendants complain is contained in the "Overt Acts" section of the indictment, which refers to proof rather than to charges; that the jury therefore could not infer the commission of additional crimes; and that defendants are not prejudiced. The Court disagrees.

To expect a jury to assume that the inclusion of language indicative of additional misconduct has no real meaning and does not charge the defendants with additional crimes merely because it is contained in the "Overt Acts" section of the indictment, is to ascribe to a jury of laymen an ability to draw distinctions that even lawyers have difficulty making. As Judge Richey of this Court said in *United States v. Hubbard*, 474 F.Supp. 64, 82 (D.D.C. 1979), "[r]egardless of their location in the indictment [such words] may encourage the jury to draw inferences that the defendants are believed to be involved in activities not

charged in the indictment." *See also, United States v. Freeman*, 619 F.2d 1112 (5th Cir.1980); *Marsh v. United States*, 344 F.2d 317, 320–22 (5th Cir.1965); *United States v. Brighton Building and Maintenance Co.*, 435 F.Supp. 222, 230–31 (N.D. Ill.1977), *aff'd*, 598 F.2d 1101 (1978); *but see, United States v. Climatemp, Inc.*, 482 F.Supp. 376 (N.D.Ill.1979). This reasoning applies *a fortiori* to language in the manner and means portion of the indictment.

Rule 7(d) of the Federal Rules of Criminal Procedure permits the Court to strike portions of an indictment to protect defendants from "immaterial or irrelevant allegations ... which may ... be prejudicial." Fed.R.Crim.P. 7(d) Advisory Committees's note. The government has been unable to point to any purpose that might be served by the language objected to by defendants. Indeed, there can be no such purpose since in its proof of the conspiracy count the government is not limited to events described in the "Overt Acts" section of the indictment; any relevant and material evidence tending to prove the conspiracy and the manner and means by which it was to be achieved is admissible. *United States v. Lewis*, 759 F.2d 1316, 1344 (8th Cir.1985); *United States v. Elliott*, 571 F.2d 880, 911 (5th Cir.1978). In sum, the language objected to by the defendants is both prejudicial to them and unnecessary to the indictment. The Court will accordingly order it stricken.

#### B. *Use of the Term "Violent"*

■ Count 1 of the indictment charges that it was a goal of the conspiracy to

> seek to influence, change and protest policies and practices of the United States government concerning various international and domestic matters

other controversial (or non-controversial) subject: it is the blowing up of buildings that is the essence of the crimes charged.

**49.** The indictment typically charges that "In order to further the objects and goals of said conspiracy, the defendants and co-conspirators would and did use the following manners and means, among others," Indictment at 2, ¶ C;

"the defendants ... would manufacture false identification documents including, but not limited to, ..." *id.* at 5, ¶ 12; "the defendants ... committed the following overt acts, among others," *id.* at 8, ¶ D; "On or about May 10, 1985, in Baltimore, Maryland, MARILYN BUCK, LINDA EVANS and LAURA WHITEHORN did possess, among other items ...," *id.* at 16, ¶ 52.

*through the use of violent and illegal means* (emphasis added).

Defendants claim that the word "violent" is surplusage and is unduly prejudicial in that none of the offenses charged includes violence as an element. Here again reliance is had on the opinion in *United States v. Hubbard, supra*, and it is claimed that Judge Richey struck from the indictment language less inflammatory than the word "violent." [50]

With due respect to the *Hubbard* court, this Court concludes that the term "violent" is appropriate here, and further that, in context, it is not prejudicial. To be sure, the commission of an act of violence is not a formal element of the offenses charged in the indictment. However, it is difficult to conclude that the deliberate setting off of bombs in a number of buildings are not acts of violence. The term "violent" is defined as "[m]oving, acting, or characterized, by physical force, esp. by extreme and sudden or by unjust or improper force; furious; as a violent assault." Webster's Collegiate Dictionary, 5th ed. By that definition, as by any common sense understanding of the term, the offenses here charged are violent offenses.

The term "illegal" does not as fully or as accurately describe the charges here as does the term "violent." Indeed, if illegality only were alleged, the alleged effort to influence, change, and protest the policies and practices of the government could have amounted to nothing more than, say, the distribution of pamphlets in places or at times not permitted by law or ordinances. Those would be entirely different charges,[51] and the term "violent" is therefore necessary, or at a minimum appropriate, to describe to the jury what it is that defendants were allegedly attempting to do. *See United States v. Sciandra*, 529 F.Supp. 320, 322 (S.D.N.Y.1982).

It should also be noted, finally, that defendants are not prejudiced by use of the term "violent," for the jury would be faced, from the first day of trial, with opening argument and evidence referring directly to bombings and the effect of bombings, thus bringing to their attention that the trial will be about violent crimes. On a matter such as this, the Court clearly has discretion. *United States v. Poore*, 594 F.2d 39, 41 (4th Cir.1979), and for the reasons stated, it exercises that discretion by denying the request to strike the term "violent."

### C. *Bill of Particulars*

 Defendants have also moved for a bill of particulars. The majority of the issues raised in that motion have been mooted either by the government's responses to defendants' requests or by the Court's decision to strike surplusage.[52] Several requests remain, however.[53]

---

**50.** Actually, the language in the *Hubbard* indictment was arguably *more* inflammatory, including such words as "infiltrate," "burglary," "cover up," "covertly," "bogus," and "operatives." 474 F.Supp. at 83.

**51.** In fact, under that hypothesis many of the arguments advanced by the defendants in other motions before the Court, which refer to alleged punishment for political activity or activity protected by the First Amendment, might well have the merit that they lack under this indictment precisely because this indictment charges violent activity.

**52.** This applies to such matters as defendants' request that the government be ordered to provide particulars identifying the means or acts alluded to in the language which the Court is ordering to be stricken. The Court's action on the defendants' motion to strike surplusage thus moots the requests in the bill of particulars

motion at page 2, ¶ 2(c); pages 2–3, ¶ 3(a) and 3(d); and page 3, ¶ 4(b).

**53.** These are as follows:

*Identify each act and statement by each co-conspirator in furtherance of the alleged conspiracy and state the time, place and circumstance of the act or statement, the participants and the persons present.* Defendants' Joint Motion for Bill of Particulars, Request 1(b). State the time, date and place for each occasion that co-conspirators combined, conspired, confederated or agreed. Request 1(c). State the time, place and circumstance under which each Defendant entered and/or withdrew from the Revolutionary Fighting Group, Armed Resistance United and the Red Guerilla Resistance, and all members of such groups. Request 3(b).
Identify each defendant or person to which each "Manner and Means" identified in the indictment, refers. Request 3(c).

The purpose of a bill of particulars is "to inform the defendant of the nature of the charges brought against him to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense ... when the indictment itself is too vague and indefinite for such purpose." *United States v. Addonizio*, 451 F.2d 49, 63–64 (3d Cir.1972). It is not the function of a bill of particulars to provide detailed disclosure of the government's evidence. *Overton v. United States*, 403 F.2d 444, 446 (5th Cir.1968).

As discussed elsewhere in this Opinion, the indictment in the instant case is not too vague (Part II, *supra*), and it adequately informs the defendants of the charges against them. Additionally, any danger of surprise is mitigated by the familiarity of the defendants with much of the government's evidence from previous trials, *see* Part I–A, *supra,* and by the fact that they have been provided with extensive discovery. Such discovery can obviate the need for a bill of particulars. *United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir.1979).

Defendants' request for particulars essentially seeks information regarding the degree of their participation in the conspiracy and the substantive offenses, and they ask for greater details concerning the manner and means by which the conspiracy was allegedly carried out. Given the detail already provided in the indictment and the discovery, defendants' request for a bill of particulars amounts to an effort to procure evidentiary material, which the Court will accordingly deny. *United States v. Pollack, supra*, 534 F.2d at 970.

The motion to strike surplusage will be granted in part and denied in part; the

motion for a bill of particulars will be denied.

## IV

### *Witness and Evidence Lists*

The defendants move the Court to direct the government to produce a list of the witnesses and of the exhibits it expects to present at trial. The defendants argue that they need this material "because of the complexity of the charges, the scope of the acts alleged in terms of both duration and distance, and because all of the events are alleged to have occurred at least several years ago, making preparation for trial difficult, if not impossible."[54] Moreover, they maintain that without an exhibit list, they will be forced to review "tens of thousands of identified documents" without knowing what, if any, role the documents might play at trial.

As the defendants acknowledge, it is within the Court's discretion, upon a showing of sufficient need, to order the government to provide a witness or evidence list. *United States v. Anderson*, 481 F.2d 685 (4th Cir.), *aff'd*, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1973); *United States v. Madeoy*, 652 F.Supp. 371, 375 (D.D.C.1987). In the view of the Court, the defendants have not made a sufficient showing of need here.

As the Court explained in Part I–A, *supra,* the defendants should already be aware of the significance of the documents provided to them during discovery, and of many of the witnesses which the government may call, because a large bulk of the evidence and testimony that will be offered at this trial has been used at previous trials of several of these defendants.[55] Further,

Identify the sympathizers and potential sympathizers described in paragraph 25 from whom the defendants allegedly sought support. Request 3(e).

Describe the manner in which each defendant is alleged to have participated or aided and abetted in the malicious destruction of government property described in counts two through four of the indictment. Request II, 1. Identify each act or statement by each defendant, describing the time, place and circum-

stance of such act or statement, other than overt acts, which reflects each defendant's participation or aiding and abetting in counts two through four. Request II, 2.

**54.** Defendants' Joint Motion to Produce Witness and Evidence Lists at 2 (Jan. 3, 1989).

**55.** *See also,* Part X, *infra.* Much of the documentary evidence provided to defendants during discovery was also discussed in previous trial and sentencing memoranda. *See, e.g.,* Gov-

defendants have hearing and trial transcripts of the testimony of witnesses who will testify here again, and they also have search warrant and arrest affidavits identifying witnesses and summarizing the information they can supply.

Defendants' complaint that it would be onerous to wade through "tens of thousands" of documents is utterly meritless for yet another reason. These defendants have had these materials for many months,[56] and they have had a team of six attorneys and one or more paralegals during all that time available to review the documents.[57] It should also be observed that the number of documents at issue here, the defendants' characterizations to the contrary notwithstanding, is not nearly as large as in a great many other criminal cases in this Court as elsewhere. It is simply incredible that, in the many months they have had available,[58] all these lawyers and paralegals have not been able to organize and review this material, and the Court does not accept that proposition.[59]

It is also worth observing that, at oral argument on this motion, government counsel represented that they had placed in separate, organized individual files, available to the defendants, the vast majority of the documents the government intends to use at trial. This of course should further facilitate defense review and preparation for trial.

Defendants' contention that the witness and evidence lists are necessary because of the complexity of the issues and the expect-ed duration of the trial is equally specious. The charges against the defendants are not particularly complex: the indictment contains but five counts, one for conspiracy and four for bombings, that is, malicious destruction of government property. As for the government's estimate of a lengthy trial, it is due not to inherent complexity but is based on the length of the previous trials of three of the defendants. And those trials were apparently lengthy in large part because the defendants entered into virtually no stipulations, thus requiring numerous witnesses to establish such normally stipulated facts as the chain of custody.

Courts faced with far more complex charges than these have denied requests for witness lists. *See, e.g., United States v. Nelson,* 606 F.Supp. 1378 (S.D.N.Y.1985) (forty-six count indictment charging seven defendants with securities and mail and wire fraud in a scheme to defraud some 1,200 investors); *United States v. Deerfield Specialty Papers, Inc.,* 501 F.Supp. 796 (E.D.Pa.1980) (eight individuals and five corporations charged with price-fixing conspiracy); *United States v. Braunstein,* 474 F.Supp. 1 (D.N.J.1979) (nineteen count indictment charging four persons and one corporation in Medicaid fraud scheme).[60]

Accordingly, the motion will be denied.

## V

### *Severance of Defendants*

A joint motion on behalf of all defendants requests a separate trial for each of

---

ernmental Trial Memorandum in Berkman's previous trial, Criminal No. 85–0222 (E.D.Pa. 1985), *filed as an exhibit to Berkman's double jeopardy motion.*

**56.** Some eight months ago, the government turned over to defendants' counsel approximately six cardboard boxes of documents.

**57.** As indicated in note 38, *supra,* the Court directed the authorities at the D.C. Jail to permit joint, unshackled meetings of all defendants and their counsel precisely to permit such activities.

**58.** It was solely at the request of defendants and to give them additional preparation time, that the Court postponed the deadline for filing motions long beyond the period that would normally be allowed.

**59.** Defendants' counsel have submitted Criminal Justice Act vouchers for very lengthy periods of work on this case.

**60.** In *United States v. Madeoy,* 652 F.Supp. 371, 375–76 (D.D.C.1987), which is mentioned in the papers, this Court did order the production of witness lists. That case involved three defendants charged with 121 counts of various offenses, such as conspiracy to commit racketeering, false statements, wire fraud, bribery, and interstate transportation of property obtained through fraud. Count one of the seventy-two page indictment alone entailed over 150 overt acts, and the RICO charge included a forfeiture request seeking the contents of some thirteen bank accounts, four mutual fund accounts, automobiles, jewelry, and much more. The instant case is not nearly as complex as *Madeoy.*

them on the basis of the government's announced intention to introduce at trial various post-arrest letters allegedly written by several of them, not only as admissions by the writer but also against the other defendants.[61]

Under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), if the government introduces a statement by one defendant that inculpates a co-defendant, the latter may be entitled to a severance and hence a separate trial. The reason for the rule is that the defendant who is inculpated by the statement will be unable to cross-examine his co-defendant, the author of the statement, if the latter fails to testify, and the person against whom the statement is used is therefore denied his Sixth Amendment right to confrontation.[62]

Rule 801(d)(2)(E) of the Federal Rules of Evidence recognizes an exception to the *Bruton* rule: the statement of a conspirator in furtherance of the conspiracy may be used against a co-conspirator even if the former does not testify.[63] In order to admit such a statement, the Court must find (1) that a conspiracy existed, (2) that both the person making the statement and the defendant against whom the statement is offered were members of the conspiracy, and (3) that the statement was made in furtherance of the conspiracy. *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir.1988); *United States v. Gantt*, 617 F.2d 831, 844 (D.C.Cir.1980).

Defendants here contend that because the statements at issue in this case, *i.e.,* the letters, were written after the arrests of the individuals making them, the participation of these individuals in the conspiracy had necessarily ended, and the statements therefore were not and could not have been in furtherance of that conspiracy. In support of this argument, defendants rely on such cases as *Fiswick v. United States*, 329 U.S. 211, 217, 67 S.Ct. 224, 227, 91 L.Ed. 196 (1946); *United States v. Postal*, 589 F.2d 862 (5th Cir. 1979); *United States v. Meacham*, 626 F.2d 503, 510–11 n. 8, *appeal after remand, United States v. Hayes*, 676 F.2d 1359, *rehearing denied*, 685 F.2d 1389 (5th Cir.1980); and *United States v. Di Rodio*, 565 F.2d 573, 575–76 (9th Cir.1977).

Although these precedents stand generally for the proposition for which they have been cited, the principle that an arrest terminates a defendant's involvement is not absolute: the test is whether the conspiracy effectively terminated with the arrest or whether it was still ongoing and the defendant was actively pursuing the object of the conspiracy notwithstanding the arrest. *United States v. Rosenthal*, 793 F.2d 1214, 1244 (11th Cir.1986);[64] *United States v. Armocida*, 515 F.2d 29, 47 (3d Cir.1975); *United States v. Register*, 496 F.2d 1072, 1079 (5th Cir.1974); *United States v. Borelli*, 336 F.2d 376 (2d Cir. 1964).

In this connection, it is necessary also to distinguish between efforts merely to conceal or cover up a completed conspiracy and efforts in which the concealment

---

**61.** The letters were written by defendants Rosenberg, Blunk, Evans, Buck, and Whitehorn; all but the Blunk letter were allegedly found in the possession of defendants Berkman and Duke (the latter still a fugitive) at the time of *their* arrests on May 23, 1985. The Blunk letter was apparently found on May 11, 1985 in the Baltimore search. The exact dates of the letters is not clear from the record before the Court. The indictment alleges that Rosenberg's letter was written between November 30, 1984 and December 1984; the Buck letter on or about May 12, 1985; the Evans and Whitehorn letters on or about mid-May 1985. Indictment at 19, ¶¶ 60, 62–64.

**62.** The *Bruton* rule applies even if more than one codefendant has made a statement and even

if the statements are interlocking. *Cruz v. New York*, 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987); *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986).

**63.** Neither failure of the government to make the conspirator who made the statement available nor its failure to inquire into the reliability of his statement violates the Confrontation Clause of the Constitution. *United States v. Inadi*, 475 U.S. 387, 394–96, 106 S.Ct. 1121, 1126–27, 89 L.Ed.2d 390 (1986); *Bourjaily v. United States*, 483 U.S. 171, 181–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144, 157 (1987).

**64.** In *Rosenthal*, the Third Circuit held that the defendant has the burden of showing withdrawal from the conspiracy. 793 F.2d at 1244.

occurs in furtherance of an ongoing conspiracy. In the former case, statements of co-conspirators are not admissible under the exception to the *Bruton* rule; in the latter they are. As the Supreme Court explained in *Grunewald v. United States*, 353 U.S. 391, 405, 77 S.Ct. 963, 974, 1 L.Ed.2d 931 (1957):

> [A] vital distinction must be made between acts of concealment done in furtherance of the *main* criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime (emphasis in original).

*See also, United States v. Perholtz, supra,* 842 F.2d at 356–57.

■ Where does the instant fact situation fit in? In the Court's view—assuming that the government's evidence matches its allegations—it is clear that (1) the conspiracy did not end with the arrest of the defendants, and (2) any acts of concealment were effected in furtherance of an ongoing conspiracy.

This was not a "one-shot" conspiracy which everyone intended to terminate, and which did in fact terminate, once its object, *e.g.*, the payment of ransom or the receipt of insurance money, had been achieved. This conspiracy is claimed to have had as its object the radical transformation, by violence, of the political structure of the United States. That kind of conspiracy, by its very nature, is an ongoing one; it does not terminate merely because one or more of the co-conspirators are arrested.[65] Everything before the Court suggests that the defendants are as determined as ever

jointly to achieve the objectives which they had prior to their arrests.[66]

The letters at issue themselves show that the defendants who allegedly wrote the letters did not withdraw from the conspiracy upon the arrests.

Thus, the Rosenberg letter (Exhibit A to Government's Opposition) is captioned in part with the words "how to proceed," and it refers to "the clear knowledge that your tasks resulting from our errors are greater than ours—we hope it is going safely."[67] The letter goes on to state, "[w]e await instructions [and] for the smoke to clear [and] are (whenever possible) anxious to struggle with the organ. about what to do." Blunk's letter (Exhibit B) is likewise replete with references to his commitment to continuing the "struggle" and rejoining the "organization" at some future time. The Evans letter (Exhibit C) starts out with "view of a strategy to move forward given the fact that so many of us have been captured." Further on, the letter lists various items that might be used to connect or locate others, and states, "so you can trace out the dangers and consequences, I'll be as specific as possible." Although observing that "any possibility of a strategy for victory are gone with all these busts," the Evans letter concludes, "we feel that above all its [sic] primary that you stay free—this probably means leaving the U.S. We support whatever it takes to keep you free to carry out our revolutionary work *wherever* it may be" (emphasis in original).

Buck's letter likewise looks to the future, concluding as follows:

> From here we are going to carry on this struggle for transformation to be able to carry on the spark of rev. anti-imperial-

---

**65.** One indicted co-conspirator—Elizabeth Duke—is still at large. Moreover, following the arrest of Rosenberg and Blunk on November 29, 1984, there was a subsequent bombing in New York on February 23, 1985, allegedly perpetrated by co-conspirators.

**66.** The government alleges that the conspiracy terminated for indictment purposes on May 23, 1985, the date of the arrest of the last two defendants, at which time the prospects for actively pursuing the conspiracy were greatly reduced.

**67.** After describing evidentiary "traces" seized by law enforcement officers, the Rosenberg letter states:

> The pigs seized on all the Fed ID and were going to pursue it with a vengeance. Also they were going to comb *all* storage places in PH and NJ and Conn.... We hope you can vacate both CT and PH asap (emphasis in original).

ism until it can catch hold again on a higher level and build an ACM that can fight to win. It will be hard from here but we are committed to doing whatever we can. Others will have to come up to build outside but how many years will that be? I know you will make a maximal contribut [sic] to the war against imperialism wherever you are.

Evidence recovered in the Baltimore search suggests that the group planned further violent attacks. According to the government, among the files seized from the Baltimore safehouse used by defendants Evans, Buck, and Whitehorn was an "In Progress" file which contained handwritten surveillance notes, pictures, exposed film, photographs, and other documents, all pertaining to potential targets, including the Aberdeen Proving Ground in Aberdeen, Maryland, and the U.S. Naval Academy in Annapolis, Maryland. That file also contained a note headed "Possible Locations," which listed as the first three such locations the Naval Ship Research and Development Center, the United States Naval Academy, and the Aberdeen Testing Center. *See* Exhibit K to Government's Opposition. Likewise, when Buck and Evans were arrested, undeveloped film in a camera they possessed contained pictures of the Naval Academy. Brochures about Aberdeen Proving Ground were found also during the search of Berkman's vehicle.

For the reasons stated, the Court concludes that the post-arrest statements of individual defendants are admissible against the other defendants as statements made in the course of and in furtherance of the conspiracy.[68] The motion will accordingly be denied.

## VI

### *Grand Jury Material*

The defendants seek to review the grand jury transcripts, claiming that there was a lack of probable cause for the return of the indictment, there was undue reliance on hearsay evidence, and prosecutorial misconduct prejudicing the grand jury occurred in the course of the proceedings.

A defendant is not entitled to disclosure of grand jury transcripts without a showing of "particularized need." *Pittsburgh Plate Glass Company v. United States*, 360 U.S. 395, 400, 79 S.Ct. 1237, 1241, 3 L.Ed.2d 1323 (1959). Defendants' assertions do not satisfy that standard.

Defendants' claim that they have a particularized need to review the grand jury transcripts to determine whether there was undue reliance on hearsay is without merit because an indictment may be based solely on hearsay. *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956). In addition, their statement that the grand jury lacked sufficient probable cause is mere speculation; the Court is not required to determine whether the grand jury had probable cause if the indictment is sufficient on its face. *Coppedge v. United States*, 311 F.2d 128, 132 (D.C.Cir.1962).

As for defendants' claim that there was such gross governmental misconduct in previous grand jury proceedings involving these defendants that similar misconduct should be presumed to have occurred also in the proceedings in this case, it is likewise without merit. In addition to being purely speculative, it is based in part on a misreading of previous grand jury transcripts,[69] and it is also based on allegedly

---

**68.** Should it turn out in the course of the trial that the evidence does not bear out this conclusion or that some of the evidence supporting this conclusion must be suppressed (*see* Part I–D, *supra*), a severance could still be ordered, or the statements could be appropriately redacted. *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

**69.** For example, defendants claim that FBI agent Mandrafina falsely represented to the grand jury in the previous trial of Linda Evans

that Marilyn Buck had been positively identified as a resident of the Cherry Ann apartments in Connecticut. In fact, the agent testified in response to a question as whether the identifications had been 100% positive, "No. These individuals have been known to constantly wear different wigs, scarves and glasses in an attempt to blur any identification of them...." Mandrafina Testimony, Exhibit C to defendants' motion, at 23.

false statements made by an FBI agent who did not even testify in the instant proceedings.[70]

Defendants next assert that references to terrorism, including FBI agents' statements that they are members of the Joint Terrorist Task Force, could have prejudiced the jury. Use of the word "terrorism" or "terrorist" in reference to the bombings that the task force was investigating, and to the acts of which these defendants stand accused, is appropriate and cannot properly characterized as improperly prejudicial. A "terrorist" is defined as one who administers or coerces a government or community by intimidation. Webster's New International Dictionary, Unabridged, 2nd ed. A person who blows up government buildings for purposes of political intimidation snugly fits within that definition.

Finally, defendants speculate that the government might have introduced substantial evidence regarding other crimes such as the Brinks robbery, and that this evidence could have prejudiced the grand jury. This combination of sheer speculation and extrapolation from previous proceedings in other districts is of course far from a sufficient showing of particularized need to warrant provision of the grand jury transcripts to the defendants. Nonetheless, the Court has carefully examined the grand jury transcripts *in camera* to ensure that there was no "gross and prejudicial irregularity" in the proceedings. *United States v. Edelson*, 581 F.2d 1290 (7th Cir.1978). The Court has satisfied itself that no such irregularity occurred in the proceedings in this case, either in terms of misleading or prejudicial statements or of other than incidental references to other offenses. The Court has also satisfied itself that the grand jury had sufficient probable cause to return the indictment.

As an alternative theory, the defendants maintain that review of the grand jury transcripts will disclose the evidentiary basis for the charges against them, and that they are entitled to them on that basis. Defendants have no right to use the grand jury transcripts to discover the evidence underlying the counts returned against them. They have been allowed extensive discovery in this case and that is sufficient; they are not allowed additionally to rummage through the confidential grand jury proceedings. Furthermore, "[t]he prosecution is not required to disclose every detail of its proposed evidence and trial strategy." *United States v. Gordon*, 493 F.Supp. 814, 817 (N.D.N.Y.1980), *aff'd*, 655 F.2d 478 (2d Cir.1981). The motion will be denied.

## VII

### Exculpatory Evidence

The defendants have moved for an order directing the government to make available all evidence in its possession that is favorable to them. There is of course no question but that, under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and Rule 16, Fed.R.Crim.P., they are entitled to exculpatory material in the possession of the government. Neither party quarrels with that elementary proposition; the devil is in the details. The government asserts that, with a few exceptions, it has already turned over to defendants all the material to which they are entitled, while defendants request the production of a large amount of additional[71] material.

### A. Legal Standard

Before examining in detail the requests made by the defendants, it is useful to

---

**70.** All of defendants' allegations as to misstatements relate to statements allegedly made by agent John Mandrafina in the grand jury proceedings involving Linda Evans. Agent Mandrafina did not testify before the grand jury in connection with the instant indictment.

**71.** The government turned over to defendants some time ago a number of boxes of documents which the Court viewed at that time. On this issue, as on others, defendants have made

sweeping statements that are clearly incorrect. Thus, they state that the government "has not adequately fulfilled even its most minimal responsibilities" with respect to discovery. Defendants' Reply at 2 n. 2. Actually, although there is here, as in many cases, room for dispute on the issue of what is required to be produced, the record indicates that government counsel have been more than forthcoming.

recall the standard to be applied under *Brady.*

█ A defendant is entitled to evidence in the hands of governmental prosecutors if that evidence is favorable to him and is "material" to guilt or punishment. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In *Bagley,* the Supreme Court defined "material evidence" as follows:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383.

What this means in practice is that a defendant does not have a right of access to all of the government's files on the supposition that something favorable might be found. *See United States v. Agurs,* 427 U.S. 97, 109–10, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1975); *United States v. George,* 778 F.2d 556, 560 (10th Cir.1985); *United States v. Little,* 753 F.2d 1420, 1440–41 (9th Cir.1984); *United States v. Davis,* 752 F.2d 963, 976 (5th Cir.1985); *United States v. Heyward,* 729 F.2d 297, 300 (4th Cir.1984).

█ Indeed, the prosecution is not required to disclose evidence that is not exculpatory but is simply not inculpatory and might merely form the groundwork for a favorable argument on the defendant's behalf. *See, e.g., United States v. Hauff,* 473 F.2d 1350, 1354 (7th Cir.1973); *Smith v. United States,* 363 A.2d 667, 669 (D.C. 1976). Likewise, although the prosecution must produce evidence reflecting that someone other than the defendant may have committed the crime, *Brady* does not create a right to information concerning all possible suspects,[72] particularly if the number of such suspects is large and evidence of their possible involvement is slight. *Jarrell v. Balkcom,* 735 F.2d 1242, 1258

(11th Cir.1984). On the other hand, the prosecution has the affirmative duty to resolve doubtful questions in favor of disclosure. *United States v. Agurs, supra,* 427 U.S. at 106, 96 S.Ct. at 2398.

## B. *Specific Requests*

█ Applying these general standards to the demands made by defendants, the Court finds that most of them are so broad and so far from requesting true exculpatory material that the government is fully justified in rejecting them. Some of these requests are for vast numbers of files from a large number of federal and local agencies regarding, without any serious attempt at differentiation, such amorphous subjects as the movement of persons and organizations "thought to have" knowledge about persons responsible for the bombings. Also in the category of unreasonable demands are requests for FBI guidelines, instructions to that agency relating to its investigation, and even a so-called "terrorist photo album."[73]

A few excerpts from defendants' requests will provide the general tenor and flavor of these requests:

> Any and all internal reports, notes, files, charts, diagrams or other recorded information made or kept by the Federal Bureau of Investigation, the Joint Terrorist Task Force, the National Security Agency, National Security Council, the Terrorism Investigation Squad–Squad # 09, the International Terrorism Unit–Squad II, the Terrorist Research and Analytical Center, the Foreign Counter–Intelligence Squad, the National Bomb Data Center for the F.B.I., the Bureau of Alcohol, Tobacco and Firearms, the joint task force between the F.B.I. and the New York Police Department, the State Department, the New York, New Jersey and Maryland State Police Departments, the New York Police Department–Squad # 37, the New York City Police Department Arson Explosive Division, the Emergency Metropolitan Washington

---

**72.** Defendants concede that they are not requesting information on all "possible suspects." Reply Memorandum at 7.

**73.** *See generally,* requests numbered 4, 5, 6c-e, 7, 9, 10, 12 (Navy Yard), 16, 22, 23.

Council of Government ... the Metropolitan Police Department for the District of Columbia, and any other terrorist-type task force or law enforcement agency, which kept track of bombings or attempted bombings, or which tabulated and/or analyzed data pertaining to any bombings which occurred during the life of the alleged conspiracy.[74]

\* \* \* \* \* \*

Any and all internal reports, notes, files, charts diagrams or other recorded information made or kept by the aforementioned agencies which kept track of the movements of persons thought to have knowledge about or connections to persons responsible for the bombings, including but not limited to information compiled about the movements, affiliations, and associations of:

a. each of the defendants;

b. May 19th Communist Organization

c. the Armed Resistance Unit

d. the Red Guerilla Resistance

e. the Revolutionary Fighting Group

f. other groups or individuals thought by law enforcement to have been responsible for the bombings, including the: F.A.L.N., U.F.F., B.L.A., C.I.S.P.E.S., J.B.A.K.C., P.F.O.C.[,] W.U.O., and the F.M.L.N.–El Salvador, or the Red Guerilla Defense.[75]

\* \* \* \* \* \*

The names, addresses and telephone numbers of those persons claimed by law enforcement to be members of the Black Liberation Army, (B.L.A.), the United Freedom Front, (U.F.F.), the Faribundo Marti National Liberation Front, (F.M.L.N.), the Palestine Liberation Organization, (P.L.O.), and the Weather Underground Organization, (W.U.O.), and include information pertaining to Ron Fliegelman, for their supposed roles in the 4 bombings which occurred in New York at

City police headquarters, the Federal Building, the Metropolitan Correctional Facility and the U.S. District Court in Brooklyn on December 31, 1982.[76]

\* \* \* \* \* \*

Any instructions relating to the investigation of the bombings, prepared and/or used in the investigation of the bombings listed in the Indictment.[77]

Specific documents requested as being encompassed within these vast categories include the *"unredacted* FBI documents" (emphasis in original) on such matters as a memorandum which discusses an entity called the Prairie Fire Organizing Committee and plans for a demonstration in the District of Columbia; another relating to 138 groups associated with CISPES; another which has to do with surveillance of a White House demonstration by CISPES and another by UFF [78] in proximity thereto; another which asks for all guidelines under which the FBI and its various task forces proceeded with their investigations; and the Attorney General's guidelines for the FBI regarding foreign intelligence collection and investigations.

Requests such as these, if granted, would be more useful for affording the defendants access to the procedures and methods of the Department of Justice and the FBI for combatting terrorism and foreign intelligence than for enabling them to achieve access to exculpatory evidence. In any event, except as stated below, these and similar requests have only the most tenuous relationship, if any, to exculpation, they are without merit, and they will be denied, except as follows.

The prosecution has stated that it will exercise its responsibility under *Brady* to determine whether the files referred to by defendants contain information exculpatory to them, and to make such information available to them. The defendants are en-

---

**74.** Request 4, Motion for Production of Exculpatory Evidence at 7.

**75.** Request 5, Motion at 8.

**76.** Request 6e, Motion at 10.

**77.** Request 7, Motion at 10.

**78.** UFF stands for the United Freedom Front; CISPES is the Committee in Solidarity with the People of El Salvador. The UFF and CISPES were at one point viewed as possible suspects in the bombings. *See infra.*

titled to that kind of focused discovery, and the Court requires that the government shall furnish to defendants a positive or negative report on these subjects within three weeks of the date of this Opinion.

On several other subjects, defendants make demands that are legitimate. With respect to some of these, *i.e.*, bomb threats received at the Army War College, the Washington Navy Yard, the United States Capitol, or the Navy Officers Club, and more broadly any such threats received regarding these targets by the government or the media,[79] the government has turned over some responsive materials. However, the government's response may not be fully adequate, particularly since evidence of bomb threats made by others could be highly exculpatory. The government shall therefore canvass the relevant government agencies and make available to defendants within three weeks hereof any evidence on this subject that it is able to collect.[80]

With respect to another category, *i.e.*, information, including evidence gathered, concerning various named individuals and organizations identified "for their alleged involvement" or "their supposed roles" in various bombings,[81] the government shall likewise ascertain whether there is any evidence that the named individuals or organizations committed any of the offenses, and it shall provide a positive or negative reply to defendants within three weeks hereof.

Defendants also request any information tending to negate any defendant's involvement in the bombing, including failures to identify and the like.[82] The government asserts without contradiction that it has submitted information concerning lineups and photospreads. In any event, the Court expects to consider the issue of the identifi-

cation of defendants in the second round of the motions hearings.

▮▮▮ Beyond that, defendants' request could be construed to include a demand for the names of individuals who were merely questioned about defendants in areas where these defendants had been expected to hide out as fugitives, and who provided negative answers to these questions. The Court agrees with the government that such information is not required to be made available, the disclosure requirement in this category being limited to persons who "actually witnessed a crime through any of his senses." *United States v. Cadet*, 727 F.2d 1453, 1469 (9th Cir.1984); *United States v. Cafaro*, 480 F.Supp. 511, 520 (S.D.N.Y. 1979); *cf. Moore v. Illinois*, 408 U.S. 786, 795, 92 S.Ct. 2562, 2568, 33 L.Ed.2d 706 (1972).

C. *Evidence Regarding Specific Suspects*

As discussed above, many of defendants' requests are amorphous, speculative, and seek evidence from the government beyond that required by the law, and far beyond the bounds of what may reasonably be called "exculpatory." This is not true of all the requests, however.

The FBI has made public statements to the press and to the Congress, including some by then-Director William Webster, first, that because of the similarity in construction and components of the various bombs used and the circumstances of the bombings, most of the bombings in the New York City and Washington areas between 1981 and 1984 were committed by the same group of individuals; and second, that specific organizations other than those with which these defendants were affil-

79. *E.g.*, Requests numbered 11, 12, 14, 17, 19. Defendants also request evidence of their electronic and other surveillance (Requests numbered 1, 2, 3, 8e, g), but the government asserts that it is not in possession of any responsive materials. However, the Court is requiring the government to provide affidavits from numerous government agencies regarding electronic surveillance of these defendants (*see* Part I–D, *supra*), and upon receipt the Court will consider the issue further.

80. This shall include evidence of any bomb threats or credit calls made with respect to the four bombings in New York listed as overt acts in the conspiracy count of the indictment.

81. *E.g.*, Requests numbered 6c, d, e.

82. Requests 8a-d, h.

iated were responsible for bombings encompassed in the present indictment.

With respect to the first of these issues, it is clear that the laboratory reports concerning bombs, bomb components, and similar objects may be exculpatory, and in fact the government has produced to defendants on just that basis both laboratory reports concerning the bombings with which the defendants are here charged and reports of comparisons between these bombings and those allegedly committed by other groups. To the extent that these comparisons suggest similarities between the bombs allegedly constructed by defendants and those constructed by others, these documents may be helpful to defendants, and the government properly turned them over.

■ However, defendants also seek far more extensive production of laboratory reports—in fact they seek all FBI laboratory reports concerning all bombings on the east coast of the United States during the time frame in which defendants are accused of bombings. Similarly, they seek all bomb-making instructions seized by the FBI from other groups. The Court has reviewed documents relating generally to these demands *in camera*, and it has concluded that defendants' request is overbroad.[83] The majority of the laboratory reports and bomb-making instructions are not exculpatory to the defendants. While it is conceivable that defendants could conjure up some argument based on some of these documents, that is not the standard.

*United States v. Hauff*, 473 F.2d at 1354; *Smith v. United States*, 363 A.2d at 669.

■ There is merit, however, to defendants' claim that they should have access to those laboratory reports that underlie the comparisons that the government has already produced. For example, if the comparison states that there are similarities between the bombing of the IBM building in Harrison, New York, and the bombing of the National War College, which the defendants are accused of committing, the laboratory report regarding the IBM bombing may be exculpatory to the defendants and should be produced. Similarly, several of the bombs are identified in the comparisons as being similar to bombs allegedly constructed by one Ron Fliegelman. On this basis, bomb-making instructions attributed to Fliegelman may also be exculpatory to defendants. Accordingly, the government is directed to produce to defendants documents A, B–1, C–4, C–8, and E–3.

■ Finally, in response to defendants' requests for all evidence that caused the FBI to suspect other organizations in connection with the bombings, the government states that it has produced all such evidence to defendants, and that this evidence consists primarily of the laboratory reports comparing various bombings. Defendants contest this statement and assert that the various statements of FBI officials regarding CISPES, the UFF, the FALN,[84] and other organizations indicate that the FBI had significant information linking them to the bombings. Defendants exaggerate the level of suspicion reflected in most of the statements they cite.[85]

---

**83.** Defendants contend that an *in camera* inspection "impermissibly infringes on defendants' constitutional rights. Defendants enjoy an unfettered right to favorable and material evidence in the government's possession." Defendants' Reply at 12. The courts have consistently held otherwise. *See, e.g., United States v. Washington*, 463 F.2d 904, 905–06 (D.C.Cir. 1972); *Application of Storer Communications, Inc.*, 828 F.2d 330, 335–37 (6th Cir.1987); *United States v. Dupuy*, 760 F.2d 1492, 1501–05 (9th Cir.1985); *United States v. Holmes*, 722 F.2d 37, 41 (4th Cir.1983); *United States v. Cadet*, 727 F.2d 1453 (9th Cir.1984). The submission to the Court of materials that conceivably may be exculpatory, but not necessarily so, for a judicial *in camera* determination of required production

is the approach that has been endorsed in the cases cited above and others.

**84.** FALN is a Puerto Rican independence organization.

**85.** For example, defendants claim that then-FBI Director William Webster and Special Agent Theodore M. Gardner told the *Washington Post* on November 13, 1983, that the UFF, the FMLN, the PLO, and the FDR were suspected in connection with the bombings. In fact, the article states that Judge Webster refused to say that one group was so suspected. The article states only that the "FBI is focusing its attention on a half dozen groups that have claimed responsibility for the bombings, or that cooperate with

Nonetheless, several officials, particularly of the FBI, issued statements which could be construed as being at odds with their current belief in defendants' culpability for the offenses with which they are charged in this Court. For example, in March 1985, in testimony before the Subcommittee on Security and Terrorism of the Senate Committee on the Judiciary, Judge Webster appeared to link the UFF with at least the United States Capitol bombing; and on March 15, 1984, an FBI spokesman told the *Washington Post* that the Bureau would identify a suspect in the bombing before a closed session of the Subcommittee, and that the suspected group was not the Armed Resistance Unit (ARU), although members of the group might have been involved.[86]

There are, then, sufficient indications that, at least at one time, the FBI considered organizations and individuals other than these defendants and the groups to which they belonged as responsible for some of the bombings, and made public statements to that effect. The laboratory materials furnished to defendants provide some clues as to the basis for these determinations or speculations, but the Court considers that the various statements made at the time are such that defendants should be allowed to explore the issue further. This would enable defendants to determine whether the material on which these several FBI statements was based is truly exculpatory.

Accordingly, the government is ordered to produce for the second phase of the motions hearings, to be held within about two weeks, either Judge Webster or some other current or former FBI official who is able to testify regarding the basis for the Bureau's then apparent belief that individuals and groups other than these defendants and the organizations to which they belong may have been responsible for the bombings charged in the indictment in this Court.

With the exceptions noted, the *Brady* motion will be denied.

## VIII

### *Courtroom Security*

One of defendants' motions challenges various measures taken to ensure courtroom security, specifically what they refer to as the "wall," two courtroom cameras, and the magnetometer which spectators must pass to enter the courtroom. Their basic claim is that these courtroom security measures, if maintained during the trial,[87] will deny them the right to a fair trial in violation of the Constitution. The Court deals with these specific issues *infra*, but it first discusses the question whether *any* security measures may validly be employed in the courtroom in which these defendants are to be tried.

### A. *Security Measures and the Presumption of Innocence*

There are two aspects to defendants' argument concerning the constitutional legality of security measures. It is contended, first, that in a trial such measures may not be employed at all, and second, that defendants' backgrounds are such that security precautions with respect to them are not justified in any event.

It is defendants' basic contention that security measures visible to the jury are inconsistent with the presumption of innocence, in that the jury will inevitably be led

---

those that have." *See* Exhibit A to defendants' motion. Such statements by various organizations claiming responsibility for the bombings charged in this indictment have been or will be turned over to defendants.

Similarly, far from indicating that the FBI had significant information linking CISPES to the bombings, the articles cited by defendants indicate that FBI suspicions proved groundless. *See* Exhibits C and D. This supports the government's contention that there is no evidence tending to inculpate CISPES.

**86.** *See* Exhibits B and E to defendants' motion.

**87.** Defendants also object to the use of these devices during the pretrial proceedings, but there is not the slightest support in the cases for that position. All the decided law deals with possible prejudice in the eyes of the jury, a position that obviously has no application during pretrial proceedings when no jury is present.

to believe that they are guilty of the crimes with which they are charged. There are several problems with that contention.

In the first place, the trial of defendants in a "secure" courtroom is due primarily to the history of their various prior escapes, their prior fugitivity, and their prior criminal convictions (*see* below), not the seriousness of the current charges (although the nature of the charges is a legitimate factor).

More fundamentally, if defendants' theory is correct—that courtroom security measures equal the destruction of the presumption of innocence—no such measures could validly be adopted with respect to the trial of any defendant, even one charged, for example, with mass murders who had a history of armed escapes, including escapes from a courthouse effected with the assistance of confederates in the trial audience. That clearly cannot be; defendants' argument proves too much; and it flies directly in the face of both common sense and Supreme Court law. *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

### B. *Backgrounds of These Defendants*

▮ Defendants argue that, whatever the validity of that conclusion in the abstract, they themselves do not present security problems. In this regard, they claim that collectively and individually they have attended as defendants eight lengthy trials in recent years, all without incident.[88] They also note that they have never escaped from a courtroom, and the incidents of their fugitivity from justice (which they do not deny), were not violent but consisted

in one case of a failure to return from a furlough, in another of bail jumping.

On the other hand, the United States Marshal, in the exercise of his responsibility to provide security in the courthouse,[89] has recommended that the District Court's secure courtroom be used because, in his expert view, the defendants are genuine risks in a number of ways and for a number of reasons. The Court is not bound by that assessment but, as will now be seen, it is a reasonable and indeed a compelling one, for these defendants present enormous risks both with respect to escape and with respect to the commission of acts of violence.

#### 1. Fugitivity

Most of these six defendants have previously escaped from federal custody, have attempted to escape from such custody, or have been implicated in aiding others to escape, as follows.

Defendant Buck was convicted of RICO charges in connection with the escape of a convicted murderer, Joanne Chesimard, from the Clinton Correctional Facility in New Jersey. Additionally, while serving a ten-year sentence for using false identification to purchase weapons, Buck failed to return from a furlough and was a fugitive from justice for eight years. Defendant Rosenberg was indicted for alleged participation in the Chesimard escape, but that indictment was dismissed upon the imposition of her 58–year sentence on other charges. Defendant Berkman was convicted of bail jumping. An investigation by the FBI concluded that Buck and Berkman may have participated in the 1977 escape of William Morales, an individual serving time

---

**88.** Susan Rosenberg, one of the defendants here, was a plaintiff in the trial in *Baraldini v. Meese,* No. 88–0764, in another courtroom in this courthouse without incident, although apparently there was no special security other than the presence of deputy marshals. However, the *Baraldini* case was a civil action brought by that defendant and others designed, *inter alia,* to demonstrate the vindictiveness of the United States government toward those who disagreed with its policies, and Ms. Rosenberg thus had a strong incentive to attend that proceeding without incident. Here, on the other hand, she is on trial on serious charges, together with five oth-

ers, where the incentives point in the opposite direction.

It is to be noted, too, that, even in *Baraldini,* a disturbance broke out in the courtroom between deputy marshals and supporters of the defendants here (plaintiffs there), and one of these supporters was ultimately convicted of violating 18 U.S.C. § 111, that is, assaulting, resisting, or impeding U.S. Marshals. *See United States v. Heid,* Criminal No. 88–0249.

**89.** 28 C.F.R. Ch. 1, Subpart T at 0.111(d).

for a bomb factory explosion.[90] As for Evans, the government asserts that a forged death certificate was filed by or for her that was used improperly to terminate her probation,[91] and that she participated in the Chesimard and Morales escapes [92]—allegations she denies.[93] Evans was also convicted of harboring a fugitive, Marilyn Buck. As for Whitehorn, she was convicted of making a false passport application and was sentenced to imprisonment for two years.[94] More recently, Whitehorn was indicted for assaulting a federal officer while riding in shackles in a car, apparently in an effort to escape, and she was found in possession at the Baltimore Jail of $200 allegedly to bribe a guard.[95] A seventh defendant, Elizabeth Duke, is still a fugitive from justice today.

Furthermore, at the time of their arrests, the defendants had in their possession many forged and otherwise false identification documents—papers that are obviously useful for disappearance in the event of escape.[96] It is not unreasonable to infer from their possession of these materials that defendants would disappear, never to face the current charges against them, if they could somehow manage to remove themselves from the courtroom.

On the issue of the likelihood that defendants would attempt to escape, it is also noteworthy that defendant *Blunk has stated that he and his associates have a positive duty to escape when apprehended,* apparently by analogy to prisoners of war. As Blunk said in his letter, "it is my duty to escape when and if that becomes possible" and that this "is also a question of organizational discipline." [97]

Finally, the defendants have strong incentives to flee aside from the Blunk admonition. Five of the six have previously been sentenced in other federal criminal proceedings to imprisonment ranging all the way from 12 years to 70 years, and they are serving those sentences now; the sixth defendant, Laura Whitehorn, faces charges in federal court in Baltimore on offenses carrying a thirteen year maximum. In the instant case, if convicted, the defendants face a maximum of an additional forty to forty-five years in federal penal institutions.[98]

**90.** *See* Motion of the United States, August 19, 1988, Exhibit J (FBI summary of investigation into Morales' escape). According to the exhibit, Morales himself implicated Buck, and Berkman, as Morales' attending physician, provided information to Morales about the prison ward from which he escaped.

**91.** Motion of the United States, August 19, 1988, at 6. Exhibit Z to that motion contains copies of the death certificate and the certificate terminating the probation. It is not known who filed the death certificate.

**92.** While some of these incidents are not verified by evidence admissible at a trial because they constitute hearsay, it is appropriate to consider them on the more informal issue of security. *State v. Moen,* 94 Idaho 477, 491 P.2d 858, 860 (1971); *Commonwealth v. Brown,* 364 Mass. 471, 305 N.E.2d 830, 836 (1974); *State v. Roberts,* 86 N.J.Super. 159, 206 A.2d 200, 204 (1965); *State v. Simmons,* 26 Wash.App. 917, 614 P.2d 1316, 1317 (1980). *Accord, United States v. Hack,* 782 F.2d 862, 866–67 (10th Cir.1986) (shackling justified *inter alia* by substantial and credible information about dangerousness including deputy marshal's reliable information from other law enforcement agencies that defendant planned to escape).

**93.** This Court's Memorandum of September 6, 1988, which discusses the conditions of defendants' confinement, noted the governmental claim that Evans assisted in the escapes of Joanne Chesimard and William Morales and its assertion that there was fingerprint evidence tying her to those escapes. In addressing Evans' objection to the consideration of these allegations because they were not proved in a criminal court, the Court concluded:

> Evans has mounted no substantial factual challenge to the government's information, and on that basis the Court sees no reason to preclude reliance thereon for [prison] classification purposes.

**94.** Defendant Whitehorn has since been paroled from that sentence.

**95.** Memorandum of September 6, 1988 at 16.

**96.** No one can know, of course, whether the seizures that were made at the time of defendants' arrests exhausted their supply or that of their confederates of these materials.

**97.** The Blunk letter was filed by the government with the Court as part of its opposition to the defendants' joint severance motion.

**98.** Whitehorn, Evans, and Buck are charged with violation of 18 U.S.C. § 371, which carries a maximum term of five years; each of the six

The Court concludes that these defendants present an enormous risk of escape from the courtroom that must be met if the processes of justice are to operate properly.

## 2. Dangerousness

On the issue of dangerousness apart from furtive escape and fugitivity, it is relevant that several of these defendants were found at the time of their arrests with truly astounding arsenals of weapons and explosives. Rosenberg and Blunk were in possession of 600 pounds of explosives and firearms, including a Browing Hi–Power 9mm pistol and a Ruger .223 caliber rifle. Berkman was in possession of 100 pounds of explosives, an Uzi semi-automatic rifle, handguns, over 2,300 cartridges of live and spent ammunition, and bulletproof body armor. A search of the apartment in which Whitehorn was arrested uncovered an Uzi submachine gun and two handguns, one of which was equipped with a silencer. It is plainly not unreasonable to draw an inference of dangerousness and possible violence from the possession of such a cache of illegal weapons and explosives.

Defendants argue in rebuttal that no one was killed or injured in the bombings with which they are charged. However, the criminal justice system may also legitimately regard those defendants as dangerous who, it is claimed, "only" bombed government and other institutional buildings, including the United States Capitol. Moreover, documents seized from defendants' persons and residences contain earnest discussions regarding the appropriateness of proceeding beyond the destruction of buildings to the infliction of harm to government officials, including their murder.

Thus, a "communique" allegedly sent by these defendants claiming responsibility for bombing the United States Capitol building states, "we purposely aimed our attack at the institutions of imperialist rule rather than individual members of the ruling class and government. We did not choose to kill any of them this time. But their lives are not sacred...." [99] The government's Revised Trial Memorandum filed in the trial of Berkman in Philadelphia, describes a document allegedly written by Berkman which discusses "when it is right to kill" and that "individuals should be killed only if their crimes are very clear (judge, prosecutor, cop, etc.)." [100] Another Berkman letter states "we have been considering an attack against the U.S. military ... our investigative work showed the possibility of doing on action that could possibly eradicate several high ranking officers." [101] That this may be more than talk is evidenced by the fact that one of these defendants, Marilyn Buck, was convicted of murder (and other offenses) in the course of her "revolutionary" career,[102] and that

defendants is charged in four separate counts of violation of 18 U.S.C. § 844(f) and 18 U.S.C. § 2, which carries a maximum of ten years imprisonment per count, or a total of a maximum of forty years for some and forty-five years for others.

In *Holbrook v. Flynn, supra,* 475 U.S. at 571, 106 S.Ct. at 1347, the Supreme Court found sufficient cause for an increased level of security in a courtroom upon infinitely less cause—the mere fact that the defendants had been denied bail after a determination that their presence at trial could not otherwise be ensured.

**99.** Communique from the Armed Resistance Unit, Exhibit E to the Government's Revised Trial Memorandum, *United States v. Alan Berkman,* Criminal No. 85–0222 (E.D.Pa.), cited at Exhibit C to Berkman's Double Jeopardy Motion, filed January 3, 1989.

**100.** Government's Revised Trial Memorandum at 16, cited at Exhibit C to Alan Berkman's Double Jeopardy Motion. The government's memorandum from which these quotations are taken stated that this document had on it at least 152 of Berkman's fingerprints and nine of his palm prints.

**101.** Letter by Alan Berkman at 3, Exhibit D to the Government's Revised Trial Memorandum, *United States v. Alan Berkman,* Criminal No. 85–0222, cited at Exhibit C to Alan Berkman's Double Jeopardy Motion.

**102.** The violent circumstances surrounding the offenses committed in the course of the "Brinks" robbery are summarized by the Court of Appeals for the Second Circuit as follows:

In the late afternoon of October 20, 1981, at a busy shopping mall in Nanuet, New York, a number of men wearing ski masks emerged from a red van and began firing an M–16 machine gun at guards unloading a Brinks armored car, killing one guard and injuring another. The gunmen quickly gathered $1.6 million from the armored car and sped off in the van.

another, Susan Rosenberg, was charged with such offenses.[103]

In view of the truly extraordinary record summarized above—escapes, fugitivity, incentives to escape, announced purpose to escape, commission of acts of violence, and plans for further violence—defendants' assertion that there is an absence of any showing of necessity for the courtroom security measures [104] is absurd.

It is impossible to quarrel with the assessment of the United States Marshal and others [105] that these defendants are genuine risks both with respect to fugitivity and with respect to violence. It is only to state the obvious, therefore, to conclude that measures are warranted to protect the interests of society, law enforcement, and the criminal justice system by preventing possible escapes of the defendants from the courtroom.

The Court will now consider whether the measures adopted here are appropriate to that end.

## C. *Magnetometer and Cameras*

 Defendants object to the presence of a magnetometer just outside the courtroom and of two surveillance cameras inside the courtroom.[106]

First. To enter the courtroom, a visitor must pass through a magnetometer. This measure, say the defendants, adds to the "extraordinary array of security measures" taken with respect to the courtroom.[107] But magnetometers have unfortunately become rather commonplace in American life, in this era of random and not so random kidnappings, hijackings, and killings. For example, anyone who has been to an airport knows that he must pass a magnetometer before boarding the aircraft, and indeed, visitors must pass through a magnetometer to enter this courthouse.

Defendants argue that, since there is a magnetometer at the entrances to the court building,[108] they are being specially singled out to jurors and others as dangerous individuals because there is an additional magnetometer at the entrance to the courtroom in which they are to be tried.

The conclusion does not follow from the premise. For example, there is a magnetometer at the principal entrance to the building housing the U.S. Supreme Court, yet visitors as well as members of the bar must pass through a second magnetometer when they wish to enter the Court chamber itself. Surely no stigma such as that claimed by defendants attaches there. Even in the courthouse in which defendants will be tried, their courtroom is not the only one equipped with a magnetometer. Visitors to the so-called Iran-contra trial of Lt. Col. Oliver North presently in progress are

Shortly thereafter, a local resident told the police that he saw the gunmen transfer themselves, the apparent proceeds of the robbery, and their weapons to a U–Haul truck. The local police located the U–Haul as it was attempting to enter the New York Thruway. When the police stopped the U–Haul to question its occupants, several men burst from the back of it and began firing automatic weapons at the police. The gunmen killed two officers and injured a third.
*United States v. Buck,* 813 F.2d 588, 589 (2d Cir.1987).

**103.** Defendant Rosenberg was initially charged in the Brinks case, but after imposition of her 58–year sentence in the New Jersey prosecution, that charge was dismissed by the government.

**104.** Defendants' Memorandum at 3.

**105.** The U.S. Bureau of Prisons and the D.C. Department of Corrections reached the conclu-

sion that there was a substantial likelihood that these defendants would attempt to escape from custody and that special handling status was appropriate. *See* this Court's Memorandum of September 6, 1988, at 5.

**106.** In their initial court appearance, defendants also complained about the poor quality of the speakers in the audience section of the courtroom which, they argued, made it difficult for spectators to hear the proceedings, thus infringing on defendants' right to a public trial. That claim was well taken. New, higher quality speakers have been installed, and the issue is now *moot.*

**107.** Defendants' Motion at 12. *See also, id.* at 3, 15, and 23.

**108.** Because of the number of persons entering and leaving the court building through the several entrances, the checks at these entrances cannot be considered fully reliable.

required to pass through a magnetometer identical to the one that is located at the entrance to defendants' courtroom.

A magnetometer is no more than a precautionary device to make certain that unbalanced persons and others with an aim bent on mischief or worse will not disrupt the proceedings; it is known to the public as such; and it does not violate defendants' rights.

Second. Two cameras are affixed to the courtroom walls near the ceiling. These cameras are quite unobtrusive, being no larger than and no different from cameras in a number of other places in the court building (*e.g.,* the entrance doors to the chambers of the Court of Appeals and District Court judges) and elsewhere (grocery stores, banks, and other commercial establishments).

The purpose of the cameras in the courtroom is to permit Marshal's personnel to observe any disturbance in the well of the court or in the spectator section; to dispatch additional deputy marshals to the scene as needed; and to prepare a tape of any such incident that could later be used to identify those responsible and to serve as evidence should criminal charges be brought. With one exception, these are appropriate uses of the cameras, and the Court will not forbid them.

Defendants are correct, however, when they maintain that these cameras should not be used for intelligence purposes. A court is a public place where justice is dispensed, and it is a place anyone should be able to attend without fear that his attendance will be recorded and used to link him to criminals or others of interest to police or intelligence agencies. Safety from such practices is one of the characteristics distinguishing a free society from a totalitarian one.

The Judicial Conference of the United States approved a proposal last year "allowing the Marshals Service to monitor courtroom proceedings by closed circuit

video equipment. No tape recordings may be made." Report of the Proceedings of the Judicial Conference of the United States, September 14, 1988, at 68. The objectives underlying that proposal were undoubtedly the same as those referred to above.

While the Marshal's Office disavows any purpose of the taping other than to produce evidence of courtroom disturbances, it seems appropriate, on balance, to follow the Judicial Conference decision. The United States Marshal is accordingly instructed that, while the cameras may continue to be used for monitoring purposes, no tape recordings may be made.

### D. *Courtroom Partition*

Defendants' principal complaint related to security is with regard to what they call, somewhat inaccurately, the "wall."[109]

As explained only three years ago by Justice Thurgood Marshall, speaking for a unanimous Court,[110] the law is

> that [not] every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against him to punish him for allegedly criminal conduct.

*Holbrook v. Flynn, supra,* 475 U.S. at 567, 106 S.Ct. at 1345. The Court went on to state that, when measures are taken in a courtroom to ensure security, the government must invoke the least instrusive means of meeting the governmental interests at risk, *Holbrook v. Flynn, supra; Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)—in this case the risk of escape, fugitivity, and violent action. The defendants argue that under this standard, the "wall" must be removed.

---

**109.** The term "wall" is usually applied to a structure made of stone, brick, or other compact and opaque material. As will be seen *infra,* the structure here involved is not of such character.

**110.** Chief Justice Burger concurred in a separate opinion.

The "wall" is actually a transparent partition or screen, made of plexiglass, indistinguishable to the naked eye from a glass divider,[111] that more or less [112] separates the spectator section of the courtroom from the bar section. To put it more clearly, the plexiglass partition divides the area where the public sits from the well of the court, where the defendants, their counsel, counsel for the government, the judge, the court staff, and the jury sit and move. *Defendants are not separated in any way, by the partition or otherwise, from the area occupied by the judge, the jury, the prosecutors, and the witnesses; only the spectators are on the other side of the partition.* And as far as these spectators are concerned, they are able to see through the partition as through ordinary window glass, and since the better quality speakers were installed (*see* note 106, *supra*), they are also able to hear as well as anyone.

### E. Legal Standard

 Nevertheless, defendants argue that, whatever may be the dictates of courtroom security, a plexiglass partition is an improper means to ensure that security. That argument of course also raises the question under *Holbrook* and *Allen, supra,* whether less intrusive alternatives capable of meeting the governmental interests at stake are available. *See also, Elledge v. Dugger,* 823 F.2d 1439, 1451 (11th Cir. 1987).

The Supreme Court and other federal courts have upheld security measures that created an atmosphere far more inimical to the interests of defendants than such a partition. In *Holbrook, supra,* the Supreme Court determined that the constitutional right of a defendant to a fair trial was not violated by the augmentation of the usual courtroom security force by four uniformed state troopers sitting in the front row of the spectator section. In *Allen v. Montgomery,* 728 F.2d 1409, 1413 (11th Cir.1984), the court held that there was no deprivation of the presumption of innocence where the defendant was brought into the courtroom in handcuffs by a large number of uniformed law enforcement officers. Similarly, in *Corley v. Cardwell,* 544 F.2d 349 (9th Cir.1976), the court held that there was no prejudice and no denial of the right to a fair trial where the defendant was required to be in court in manacles, and in *Wilson v. McCarthy,* 770 F.2d 1482 (9th Cir.1985), it reached the same conclusion where a defense witness was similarly shackled. *See also, Loux v. United States,* 389 F.2d 911 (9th Cir.1968) (leg irons, handcuffs, and belt to which shackles were attached by a chain).

Defendants, for their part, cite a number of judicial decisions on courtroom security and fair trials; however, not one of these decisions supports their argument.

For example, in *Illinois v. Allen, supra,* cited by defendants, the Supreme Court *upheld* the forcible removal of a defendant from the courtroom and stated that the trial court could have alternatively bound, shackled, and gagged that defendant; in *Dorman v. United States,* 435 F.2d 385 (D.C.Cir.1970), also relied on by defendants, the court *upheld* the placing of deputy marshals behind the particular criminal defendants on trial there; and *United States v. Carter,* 522 F.2d 666, 677 (D.C.Cir.1975), merely foreshadowed the *Estelle* decision *infra,* with respect to prison garb.

The only even remotely relevant decisions cited by defendants [113]—cases in which security measures were held to have been improper—are *Estelle v. Williams,* 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976), where the Supreme Court held that a court may not compel a defendant to

---

**111.** In appearance, the partition largely resembles the third floor east and west entrances to the appellate judges' chambers in this courthouse.

**112.** The partition does not reach all the way to the ceiling but only about two-thirds of the way up. There is a door in the partition that can be locked.

**113.** A number of other decisions are cited in defendants' memorandum for all sorts of different propositions, but those cases have little, if any, bearing on the present case. *See, e.g., Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (pretrial publicity).

appear in prisoner's clothing, and *Walker v. Butterworth*, 599 F.2d 1074 (1st Cir. 1979), and its progeny (including *Young v. Callahan*, 700 F.2d 32 (1st Cir.1983), cited by defendants), where the courts addressed trial judges' rulings that defendant could not sit at counsel table, but had to remain throughout the trial in a four foot high prisoner's dock or box.[114]

The vice condemned in these cases was the singling out of the defendants from all others in the courtroom (whether by clothing or location), because such measures are constant reminders of the accused's condition, a "brand of incarceration," and a condition which burdens effective consultation with counsel. 700 F.2d at 35–36. Here, of course, the plexiglass partition separates *all* the participants in the trial from the outside spectators; the defendants are not separated or singled out in any way.

In sum, in spite of a great deal of verbiage contained in their lengthy memorandum, defendants have cited *no* case law casting doubt on the constitutional legality *per se* of the plexiglass partition.

### F. *Alternatives to Existing Security Measures*

 Since the government plainly has a legitimate interest in ensuring that the defendants do not abscond and that their associates and supporters[115] do not take over control of the courtroom, the question nevertheless arises as to whether other,

less burdensome alternatives to a plexiglass partition are available.

In this respect, in hyperbole that is extravagant even for them, defendants claim that the partition and the cameras establish an "atmosphere of danger, fear and loathing ..." and that "[t]hese are measures unfamiliar to even the most repressive totalitarian regimes."[116]

First. In support of their contentions, defendants argue that the partition is a special device installed by an oppressive government to intimidate them and their outside political supporters. These arguments rest on erroneous factual premises. The secure courtroom with its partition was not even constructed for this trial; it was built and placed in operation by decisions, made by the chief judges of the two courts occupying this courthouse, that were entirely unrelated to this case, and that were implemented before the indictment in this case was handed down.[117] That courtroom was intended to be used, in fact, in any case where significant security problems are present. Moreover, it is not even limited to such cases; it is the regular courtroom of my colleague, Judge George Revercomb, who routinely hears all his civil and criminal cases there, most of them obviously presenting no special security concerns.[118]

Second. Defendants argue that the measures here are unprecedented (*see* note 116, *supra*), and they have submitted affidavits

---

114. In *Butterworth*, the court stated that the prisoner dock "must be considered, as a general matter, to be an unconstitutional practice," but it did not decide whether the use of the dock in that particular case constituted harmful error. 599 F.2d at 1081. In *Young*, the court maintained that the prisoner's dock could be used but only when reasonably necessary to maintain order and the jury is instructed that such restraint is not to be considered in assessing guilt. 700 F.2d at 36–37. The *Young* court then held that it was unconstitutional error to confine the defendant to the prisoner's dock because the trial judge had not made a finding that restraint was necessary. *Id.* at 37.

115. That such associates and supporters exist, of that there can be no doubt. *See* note 88, *supra*. When hearings are held, such supporters are usually present outside the courthouse and inside the courtroom.

116. Defendants' Memorandum at 4, 23. Defendants also say that "the 'security' measures in question are the most drastic ever used by the government in like political or criminal conspiracy prosecutions." *Id.*

117. This secure courtroom was constructed, along with additional security measures installed at the courthouse, at the direction of Chief Judge Patricia Wald of the U.S. Court of Appeals and Chief Judge Aubrey Robinson, Jr., of the U.S. District Court.

118. The government has submitted a list of twelve criminal trials that Judge Revercomb has conducted in that courtroom since the construction of the partition.

from several individuals to the effect that they have never seen plexiglass partitions or monitoring cameras elsewhere. Whatever particular individuals may or may not have seen, the assumptions made in these statements are wrong: plexiglass partitions exist in courtrooms in other jurisdictions,[119] and the use of monitoring cameras has been endorsed by none other than the Judicial Conference of the United States.[120] Moreover, even the most cursory check reveals that the remaining representations made are likewise seriously misleading, both with respect to this country,[121] and elsewhere.[122]

Third. Beyond all that, however, is the overriding principle that this is not a subject for debate regarding the optimum security balance between the Court and the United States Marshal, on the one hand, and the defendants, on the other.[123] Within the bounds of the right of defendants to a fair trial, it is the Court that is responsible for the security of the courtroom, and it decides, first, whether any special security is needed, and second, on the most appropriate security safeguards under the particular circumstances.

On the first issue, as indicated above, no reasonable person could entertain the slightest doubt that special security measures are necessary and appropriate with respect to these defendants, given their truly extraordinary record of escapes, fugitivity, violence with respect to property, plans for violence against persons, avowal of the belief that they have a political duty

119. For example, in the 1979 racketeering trial of members of the Hell's Angels motorcycle club in San Francisco, spectators were required to pass through two metal detectors and to sit behind a bullet-proof plexiglass partition in the courtroom. *New York Times*, June 16, 1980, at A17, Col. 2. Similarly, at the West German trial of Mohamed Ali Hamadi, charged in the hijacking of an American airliner and murder of a U.S. Navy diver, a $6.6 million courtroom was constructed *in his jail* and spectators and journalists viewed the trial from behind a bullet-proof glass partition in that facility. *The Reuter Library Report*, July 5, 1988.

Indeed, defendants' experts could not have looked very closely or very far. The D.C. Superior Court in this very city maintains a "secure" courtroom in which a plexiglass partition can be deployed to separate the well of the court from the spectator section. This partition was used, *inter alia*, during the trial of members of the so-called Eighth and H Street gang for the murder of Catherine Fuller.

120. *See* p. 836, *supra.*

121. For example, the affidavit of one Ronald L. Kuby, attached to defendants' memorandum, points to the trial of Raymond Luc Levasseur in the Eastern District of New York as an example of a trial of dangerous defendants in which there were no cameras or partition. That much appears to be true. However, the affidavit does not mention that the trial security measures included an array of as many as twenty-seven deputy marshals in the courtroom, including three deputies for each male defendant and two for each female defendant, sitting in close proximity to them, with one deputy armed with a stun gun for each defendant.

Similarly, the affidavit of William Mogulescu points to the 1983 trial in New York of the defendants charged in the Brinks robbery and states that there, as in other trials he had observed, the extra security precautions do not "remotely compare with what is being considered in this case." In that trial, the special security measures consisted, *inter alia*, of twelve to fourteen and sometimes as many as twenty marshals stationed in the courtroom, all of them specially trained in the martial arts.

122. In arguments supported by affidavit defendants unfavorably compare the secure courtroom here with conditions under which defendants are tried in such places as South Africa, the West Bank of Israel, and Northern Ireland. Such contentions evidence nothing as much as a loss of touch with reality.

In some of the places to which defendants refer, as well as in other foreign countries, accused persons may sometimes be held for months or longer in administrative detention without ever being tried; elsewhere defendants are tried in secret without the opportunity for any attendance by the public; in other places, such as the Soviet Union, in ostensibly public trials only members of the secret police or other hand-picked functionaries have been permitted to occupy the "public" section of the courtroom; and in still others military trials are customary for many classes of offenders, including those who consider themselves revolutionaries, or other presumed opponents of the state. Tight shackling and the attendance of uniformed personnel next to or surrounding the prison-garbed defendant are commonplace. Even in Great Britain, the accused sits in isolation from everyone, including his counsel, except for a uniformed police officer directly by his side.

123. Nevertheless, the Court entertained and carefully considered motions, memoranda, and affidavits from the parties, and it held a hearing on the motions.

to flee, and the incentive to flee because of the enormous number of years of federal imprisonment they face.

On the second issue, it is again the Court, with the advice of the United States Marshal, that decides what kind of security measures are most appropriate. To be sure, the Court is not free to do as it pleases. For example, it may not impose security measures that single out the defendant in the courtroom by requiring him to wear special clothing or to sit in a special, conspicuous place. However, outside the category of measures which would deprive defendants of a fair trial, the decision is that of the Court.

In view of the record of these defendants for flight from justice and for the commission of acts of violence summarized above, the Court has concluded that breaches of security could most readily be prevented by use of the courtroom constructed in this courthouse precisely for cases such as this, including the partition between the visitors section and the well area where all the actual trial participants operate.[124]

One factor weighing in that decision is the number of individuals involved in this case. The six defendants are, of course, represented by six attorneys who, in turn, are assisted by at least one paralegal.[125] In view of these numbers, and of the fact that the defendants have been permitted by the Court to appear in street clothing rather than in prison garb, it is difficult, in view of these numbers, for the deputy marshals, as for everyone else, to keep track of who is filling what role and who may appropriately enter and leave the area.

The problems of numbers and of identification of the various individuals on the defense side is aggravated by the fact that at every court hearing defendants seek to import additional counsel, so-called volunteers, amicus curiae, or both, to assist or to take over from regular counsel. The effort to bring in these additional people is invariably made at the very last moment, as court proceedings are about to begin or are already in progress.[126] Similarly, defense counsel have sought the authority to have different paralegals attend different court sessions.

Whether or not that is the purpose of these various requests, the inevitable effect of this proliferation of persons in the well of the court is to complicate any effort by the deputy marshals to prevent individual defendants from simply walking away[127] into the courtroom's spectator section.[128] This difficulty is likely to be aggravated as the trial extends into weeks or months, as different deputy marshals are assigned to this courtroom, and as, in addition to all others, witnesses will enter and leave. All these problems are most appropriately alleviated by the courtroom partition, for to achieve the same degree of security from escape as by the partition, the intrusive presence of so many deputy marshals or police officers would be required as to transform the courtroom in appearance into an armed camp.

Another alternative—the shackling of defendants to frustrate possible attempts to escape from the courtroom—is obviously less desirable than use of the partition. In fact, because of the punitive nature of the shackling and the expected duration of defendants' pretrial confinement, the Court acceded to defendants' urgent requests and ordered the D.C. Department of Corrections to remove the shackles from them while they were meeting with counsel at

---

**124.** As noted above, provisions have been made so that the visitors are able to see and hear as if the partition were not there, and the defendants are not singled out or separated from the judge, the prosecutors, and the jury: all of them interact as in any other courtroom.

**125.** In order to afford defendants maximum assistance from counsel, the Court has allowed at least one, and at times more than one, paralegal to sit at or near counsel table.

**126.** An "appearance" is typically entered on behalf of a particular defendant just about that time by counsel unfamiliar to court personnel.

**127.** It may be assumed that counsel and other non-defendants would indignantly reject any measure by a deputy marshal to prevent them from exiting toward the public section pending verification of their identities. At a minimum, this would cause disputes and disruptions.

**128.** *See also,* notes 88 and 115, *supra.*

the D.C. Jail, even though such shackling is perfectly legal under the applicable regulations given defendants' status under U.S. Bureau of Prisons and D.C. Department of Corrections policies. *See* note 38, *supra.* The Court is not about to import shackling into the courtroom unless that becomes absolutely necessary.

In sum, the Court has canvassed the possible alternatives to a plexiglass partition, and it has concluded that there are no practical alternative security measures of comparable efficacy that are less intrusive. The alternative that remains—the one to which defendants obviously point their arguments—is the absence of any and all security measures, and reliance instead on the hope that defendants will cause no problems, that they will not disappear from the courtroom even if that was not difficult to do. The Court and the United States Marshal would be acting irresponsibly if, given defendants' record of escape, fugitivity, and violence, they took no security precautions based on that hope. Certainly, no one would be justified in assuming that individuals who appear sincerely to believe that they have a moral or political duty to escape would be false to that conviction if given the opportunity to implement it.[129]

In any event, the Court has neither the obligation nor the intention, given the defendants' past performance, to order the United States Marshal to eliminate the existing security measures, which the Court finds to be both reasonable and necessary. The motion will therefore be denied.

## IX

### *Conspiracy Count*

Defendants Whitehorn, Evans, and Buck move to dismiss the conspiracy count on the basis that it fails to specify an illegal agreement to commit an offense against the United States, the argument being that the object of the conspiracy was largely legal and protected associational activity. In the same vein, these defendants assert that many of the manners and means and overt acts described in the indictment are protected activity, such as the issuance of communiques and the writing of letters.[130] This motion covers much of the ground already amply discussed above, *e.g.,* in Parts I and II.

There is no doubt that the right to associate with others to advocate political beliefs is constitutionally protected. *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Similarly, it is not illegal to join a group that advocates the violent overthrow of the government. *Noto v. United States, supra,* 367 U.S. at 297–98, 81 S.Ct. at 1520–21. If that were all that was charged in the indictment, the charges against the defendants would be subject to dismissal. In this case, however, as the Court has had to repeat again and again, more has been charged.

The goal of the conspiracy described in the indictment is not simply to bring about change in United States policies, but to seek to do so using "violent and illegal means." In fact, the indictment goes further: it charges that the defendants have already employed such violent and illegal means. Eight different bombings are listed in the overt acts section of the conspiracy count; these three defendants are also described as being personally involved in various other illegal acts, ranging from the possession and use of false identification papers to the possession of firearms.[131]

To be sure, some of the activities listed as manners and means or overt acts may

---

**129.** Indeed, defendants appear to have deep-rooted beliefs in the lack of legitimacy of the system of government existing in this country, and they may therefore be presumed to have no compunctions about frustrating its processes of justice.

**130.** Allied to the claim that the conspiracy charged amounts to one to engage in protected activity, these defendants further assert that the

joinder of the conspiracy count to the substantive counts subjects them to the risk of conviction of the substantive bombings based on their involvement in associational and political activity.

**131.** Defendants also allegedly possessed items such as time delay firing mechanisms, further suggesting their involvement in violent activity.

be legal First Amendment activities; however, the law does not require that all the actions listed as overt acts in a conspiracy case be illegal. *United States v. Rabinowich*, 238 U.S. 78, 86, 35 S.Ct. 682, 684, 59 L.Ed. 1211 (1915). Furthermore, as indicated, many other alleged actions of the defendants, such as blowing up buildings and possessing explosives and unauthorized weapons, are plainly illegal. Even speech that is likely to incite bombings is explicitly excepted from *Brandenburg's* protections, 395 U.S. at 447, 89 S.Ct. at 1829; certainly actual bombings are not protected.

The motion of defendant Whitehorn, Evans, and Buck will be denied.

### X

#### *Double Jeopardy*

■ Defendants Berkman, Blunk, and Rosenberg have moved for a dismissal of the indictment against them, asserting that it violates the Double Jeopardy Clause of the Constitution. U.S. Const. Amendment V.

#### A. *Background*

The Supreme Court explained in *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969), that the Double Jeopardy Clause protects defendants against three distinct governmental activities: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. It is the second of these protections that, according to defendants, is violated by this indictment. In order to appreciate that claim, it is necessary to detail the rather unusual juxtaposition of fact and law that underlies the indictment of these defendants.

Defendants Blunk and Rosenberg were arrested in Cherry Hill, New Jersey, on November 29, 1984, as they were attempting to unload a large quantity of explosives and weapons from a U–Haul trailer into a rented public storage area. They were subsequently charged in the District Court for the District of New Jersey with conspiracy to receive and possess weapons and explosives and with numerous substantive counts involving possession and transportation of weapons and false identification documents. After a lengthy trial, both defendants were convicted, and each was sentenced to imprisonment for 58 years.

Defendant Berkman was arrested on May 23, 1985, also while in possession of explosives, weapons, and false identification papers. He was indicted, tried, and convicted in Philadelphia, in the District Court for the Eastern District of Pennsylvania, of conspiracy to possess firearms, explosives, and false identification papers, and of fourteen substantive counts charging possession of such items. On May 29, 1987, Berkman was sentenced to a term of ten years imprisonment and five years probation. Subsequently, he pleaded guilty to bail jumping, for which he received a consecutive two-year sentence, and he entered a plea of nolo contendere to a charge of armed robbery in Connecticut where he was given a concurrent two-year sentence for that offense. Berkman is accordingly now serving an effective total sentence of twelve years.

Neither the conspiracy of which Berkman was convicted in Philadelphia nor the conspiracy of which Blunk and Rosenberg were convicted in New Jersey included as formal elements of these offenses the acts of bombing [132] charged in the indictment in this Court.[133] Thus, under the traditional double jeopardy test generally attributed to *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306

---

**132.** 18 U.S.C. § 844(f) provides for the punishment of anyone who "maliciously damages or destroys ... by means of fire or an explosive, any building ... owned, possessed, or used by, or leased to, the United States...." The viola-

tion of section 844(f) will herein generally be referred to as "bombing."

**133.** The substantive offenses of which the defendants were convicted likewise differed from the substantive offenses charged here.

(1932) [134]—whether each offense involves proof of an element that the other does not—defendants' argument would have to be summarily rejected. Under *Blockburger*, the double jeopardy inquiry focuses only on the statutes violations of which are charged: does the statutory violation charged in the second indictment require proof of an element or elements that were not required to be proved under the statute involved in the first indictment, and vice versa? If the answer is in the affirmative, the double jeopardy defense fails. The government opposes defendants' motion on just that basis.

However, in the years since *Blockburger* was decided, refinements have emerged in double jeopardy law which require an analysis of the facts necessarily proved and to be proved in the two prosecutions, as distinguished merely from the formal charges themselves. And the facts in this case are compelling. Because there is no direct evidence of any defendant's involvement in the bombings, and because the circumstantial evidence linking these three defendants to the bombings consists of their involvement in the conspiracy for which they have already been convicted, the government must relitigate and re-prove the prior conspiracy trials in full; and it intends to do so. This creates a substantial double jeopardy problem. *See Illinois v. Vitale*, 447 U.S. 410, 420, 100 S.Ct. 2260, 2267, 65 L.Ed.2d 228 (1980); *United States v. Allen*, 539 F.Supp. 296, 311 (C.D.Cal.1982). Before discussing these legal developments in detail, it is appropriate for a better understanding of the issues to relate what was alleged and proved in the previous trials of these defen-

dants and what the government expects to prove with respect to them here.

### B. *The Charges Are the Same*

Put simply, as will be explained below, insofar as proof of the culpability of these three defendants is concerned, the evidence that the government expects to use in this case will be precisely or almost precisely the same as that which it used to convict these defendants in their earlier trials.

It is useful to test this proposition by first comparing the formal charges here with the charges brought in the Philadelphia and New Jersey prosecutions of these defendants. As indicated *supra*, the indictment in the present case consists of one count of conspiracy to change the government by illegal and violent means (18 U.S.C. § 371) and four substantive bombing counts (18 U.S.C. §§ 844(f) and 2). In critical and substantial respects, the conspiracy count here replicates the conspiracy counts of which these three defendants have already been convicted.

In fact, of the 19 out of 66 overt acts charged here involving actions by these three defendants, 14 are identical to the overt acts charged with respect to the conspiracies of which these defendants have already been convicted. As for the remaining five overt acts, four relate no more specifically to the charges here than they did to the earlier charges,[135] and the fifth concerns evidence actually used in the Philadelphia trial.[136] The short of it is that *the conspiracy count of the indictment in this case sets out no acts allegedly linking these defendants to the bombings that were not already previously charged and tried.*[137]

---

**134.** Actually, the test was first announced in *Gavieres v. United States,* 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489 (1911), but it is generally known as the *Blockburger* test.

**135.** One of these four overt acts involves an armed robbery of a stop-n-shop in Connecticut that was allegedly committed by Berkman and Blunk; two others allege visits to an apartment in New Haven by Susan Rosenberg; and the remaining overt act involves the writing of a letter by Rosenberg that analyzes the circumstances of her arrest in New Jersey.

**136.** That overt act describes Berkman's letter, discussed below, which refers to the November 7, 1983 communique regarding the Capitol bombing. Although the writing of this letter was not charged as an overt act in the Philadelphia indictment, the letter was used as evidence at that trial.

**137.** Broken down by defendants, the situation is as follows.

Berkman is mentioned in seven overt acts of the current indictment. If all of the acts for which he has already been tried are eliminated,

Indeed, the government here concedes, as it must, that "[t]he conspiracy charged in the Philadelphia indictment was merely a part of the bombing conspiracy which is set forth in count one of the District of Columbia indictment. As such, many of the same overt acts appear in both indictments."[138] Likewise, the government states that "the conspiracy charged in the Newark indictment was a part of the larger bombing conspiracy set forth in the District of Columbia indictment in which the defendants are charged as unindicted co-conspirators."[139]

### C. The Evidence Is the Same

Recognizing the double jeopardy problem that would result from charging these three defendants with conspiracy here after having convicted them of involvement in substantially the same conspiracy in the two previous trials,[140] the government has identified them in the conspiracy count of the current indictment only as unindicted co-conspirators, charging them criminally only with the substantive bombing counts. But that technical difference does not resolve the double jeopardy issue, for defendants' guilt of these substantive counts depends entirely upon proof of the conspir-

acy charge. For that reason, it is immaterial whether the defendants are indicted or unindicted for conspiracy; the conspiracy evidence can and will be used against them in either event. What is significant, however, and the subject that will now be discussed, is that the evidence linking these defendants to all the offenses charged in this Court, whether conspiracy or substantive, is the same evidence in critical respects as that which led to their previous convictions.

First. In response to questions by the Court, government counsel conceded that it has *no evidence against Berkman that was not introduced in Philadelphia.*

Indeed, in the prior Berkman trial, the government affirmatively claimed that the evidence there proved bombings—the very bombings that are the subject of the indictment here.[141] In its trial memorandum in the Philadelphia case, the government stated that the "evidence ... plainly link[s] Berkman to at least one bombing ... and to planning for future 'actions' or 'attacks against the U.S. military,' " and it listed all the bombings for which the ARU or the RFG had claimed responsibility, including the four bombings charged in the indict-

---

only two remain. One of these two, one (for which he has already entered a plea of nolo contendere) involves the robbery of a Stop-n-Shop in Connecticut and has nothing to do with any bombings, and the other involves the letter regarding the Capitol bombing which was introduced at Berkman's previous trial.

Blunk is named in eight overt acts, of which only one was not also contained in his previous conspiracy indictment. That overt act, in which Berkman is also mentioned, involves the Stop-n-Shop robbery. Rosenberg is mentioned in ten overt acts in this indictment, of which three remain after the evidence pertaining to her previous trial is excluded. Two of these acts charge visits to apartments in New Haven, and one involves a letter she wrote after her arrest discussing the possible "traces" that had been left after her arrest. None of the three mentions any bombings.

**138.** Government's Opposition at 2.

**139.** Government's Opposition at 5. To the extent that these statements indicate that the government has subdivided a single conspiracy for purposes of prosecution into several smaller conspiracies, it may have thereby subjected the

defendants to double jeopardy on that basis. *See* note 164, *infra.*

**140.** *See United States v. Mallah,* 503 F.2d 971, 986 (2d Cir.1974).

**141.** In Berkman's 1987 conspiracy trial in Philadelphia the prosecution evidence consisted, in addition to the proof of defendant's possession of explosives, weapons, and false identification, of instructions for building bombs and of various "communiques" issued by organizations of which Berkman was a member. These communiques were directly concerned with bombings.

Thus, one such communique, issued by the Armed Resistance Unit (ARU) on November 7, 1983, begins with these words, "Tonight we bombed the U.S. Capitol Building...." A letter in Berkman's handwriting which refers to the November 7, 1983 communique and explains that the group's intent, as reflected in the communique, was to damage the building, not to kill members of the United States Senate, was another part of the proof. Another communique introduced as part of the government's evidence proclaims the responsibility of the ARU for the bombing of the Washington Navy Yard.

ment now before this Court.[142] In short, the Philadelphia trial memorandum demonstrates the correctness of government counsel's concession: what evidence there is of Berkman's involvement in the bombings charged in the current indictment was previously introduced at the Philadelphia trial and was used to convict him there.

Second. As to Blunk and Rosenberg, the situation is somewhat more complicated.[143] Counsel for the government stated in this Court that the evidence here would be the same as in the previous trial of these defendants, except for the additional evidence, having to do circumstantially with bombing, that was seized at the Alameda apartment house in Baltimore several months after Blunk and Rosenberg were convicted in New Jersey. However, that fact is not significant, for several reasons.

In the first place, as will now be seen, the proof at the previous trial of Blunk and Rosenberg also included evidence that could have been used to tie these defendants to the bombings—the very offenses that are charged here—just as did the proof produced at the first trial of Berkman.

The critical circumstantial evidence linking these defendants to the bombings are the 600 pounds of explosives, the explosive devices, and a driver's license bearing the name Susan Knoll, all of which were in Blunk and Rosenberg's possession at the time of their arrests in New Jersey, and all of which formed the heart of the conspiracy trial in Cherry Hill. According to the government, someone using the name Susan Knoll checked into a Washington, D.C. motel on the day before the Officer's Club bombing. In addition, similarities exist between the blasting caps and explosives found in New Jersey and those used in several bombings.[144] Following the arrest of Blunk and Rosenberg in New Jersey, the FBI conducted a detailed analysis of the explosives and explosive devices and noted the similarity between the blasting caps in their possession and those used in several bombings.[145] These facts are significant in two respects: (1) they demonstrate that evidence linking these defendants to the bombings in this case was in the government's possession at the time of their previous trial; (2) based on its presentation of this same evidence, the government will now ask the jury to draw different inferences than were drawn in Philadelphia.

To be sure, evidence from the Alameda apartment house does provide some further additional circumstantial links between the conspiracy as a whole and the bombings.[146]

---

**142.** *United States v. Alan Berkman,* Criminal No. 85–222, Government's Revised Trial Memorandum at 17–18 (Exhibit C to Berkman's Motion).

**143.** In the case of Blunk and Rosenberg, there was no evidence of communiques taking responsibility for bombings in their previous trial. However, there will be no more evidence in their forthcoming trial tying these defendants personally to the bombings than there was then; they will still be tried on circumstantial, largely non-bombing evidence just as they were in their earlier trials.

**144.** Even in the government's offer of proof in this Court as to the involvement of all of the defendants in the bombings, it cites the blasting caps and identification in their possession in Cherry Hill—the very evidence used to convict them of the previous conspiracy charge. Government Opposition at 20–21.

**145.** *See* Government Exhibit D–15, FBI Laboratory report regarding evidence seized in Cherry Hill, New Jersey.

**146.** An exception to the standard in *Brown* and *Vitale, infra,* exists where the government is "unable to proceed on the more serious charge at the outset because the additional facts necessary to sustain the charge have not occurred or have not been discovered despite the exercise of due diligence." *Vitale,* 447 U.S. at 420, n. 8, 100 S.Ct. at 2267, n. 8. That exception does not assist the government here.

Certainly as to Berkman, and to a great extent as to Blunk and Rosenberg, the government had sufficient evidence to sustain substantive bombing charges in their prior trials under the same aider and abettor theory used here. What additional evidence the government may have garnered since those trials as to these defendants does no more than link them somewhat more firmly to the groups allegedly responsible for the bombings. However, there was ample evidence linking those defendants to these groups in the prior trial. Thus, this additional evidence, as pointed out above, only cumulates the defendants' involvement in the conspiracy for which they have already been convicted. Finally, the government maintained at oral argument that the reason it did not or could not bring the

However, not only is that evidence cumulative; it suffers from an even more serious defect in this context: it no more links Blunk or Rosenberg directly to the bombings than did the New Jersey evidence; it only links other defendants to those acts. The only way Blunk and Rosenberg can be convicted of the bombings, therefore, is through proof of their involvement in the prior conspiracy, and that, of course, raises the very double-jeopardy problem that underlies the entire prosecution of these three defendants. Thus, while the current trial will include new evidence regarding the bombings themselves, the actions of other defendants, and of communiques issued by unknown individuals, the evidence regarding the involvement of Blunk and Rosenberg will be, fact for fact, witness for witness, all of the evidence that was used in the District Court for the District of New Jersey.[147]

Third. The importance of the actual similarity of the evidence in the previous two trials with the forthcoming trial here cannot be overstated.

As the conspiracy charge in the indictment, as well as the representations of government counsel, reveal, the government intends to prove at this trial that Blunk and Rosenberg drove a rented U-Haul from New Haven, Connecticut, to Cherry Hill, New Jersey, on November 29, 1984; that Blunk rented the U-Haul under the alias of William J. Hammond; that they were arrested while unloading quantities of explosives into a rented self-storage area; that the weapons and explosives in their possession included 75 Dupont # 8 Electric Blasting Caps, 25 Hercules Delay Electric Blasting Caps, 199 sticks of Hercules Unigel Tamptite Dynamite, 50 pound bag of Hercules "Hercomix," a blasting agent, 110 cartridges of Dupont Tovex 210 water gel explosives, 24 bags of Hercules Slurry Hp-374, a blasting agent, and detonating cord;

and that also in their possession at the time of arrest were a Browning Hi–Power 9mm caliber pistol and a Ruger .223 caliber rifle.

As to Berkman, the government intends to prove that he drove from Philadelphia, Pennsylvania to Doylestown, Pennsylvania, with Elizabeth Duke on May 23, 1985 in a blue Toyota registered in the alias of Francis Marshall; that false identification documents were in the Toyota; that they possessed keys to a garage in Doylestown rented in the name of Karen Baker; that in the garage were over 100 pounds of explosives, an UZI semi-automatic rifle, handguns, and manuals on firearms, munitions and explosives; and that he wrote a letter discussing the motivation behind an ARU communique claiming credit for the Capitol bombing and had another communique in his possession.

The proof of these allegations will necessitate testimony from witnesses including the arresting officers, the introduction of photographs, and of a large number of documents and other physical evidence.

Both with respect to Blunk and Rosenberg and with respect to Berkman, *all of this evidence will duplicate in every detail the evidence used in the earlier trials to convict these individuals.*

While it may seem strange that this should be so, given that the charges brought in Philadelphia and New Jersey differ from those that are pending here, this is largely explained by the fact that the critical evidence on all three conspiracy charges and on the substantive counts in the current indictment[148] is purely circumstantial,[149] and that the government is simply asking the jury in each instance to draw a different inference from that circumstantial evidence.

In the previous trials, defendants' possession of dangerous items, and in one instance the writing of "bombing" letters,

---

bombing charges at the prior trials was lack of venue, not insufficient evidence.

**147.** *See also,* p. 847, *infra.*

**148.** The evidence of possession of explosives, weapons, and false identification documents, that is circumstantial as to the bombings

charged here, was direct in regard to the possession charges in Philadelphia and New Jersey.

**149.** The government concedes that it has no direct evidence linking any of these defendants to any actual bombing incidents.

were used to support the inference that they conspired to possess and transport firearms, explosives, and false identification; in the trial to be conducted here that same evidence is expected to be used to support the inference that the defendants aided and abetted the commission of the bombings that are the crux of the current conspiracy and substantive charges.[150] In short, the actual conduct for which these three defendants are being tried is the same as that for which they were tried previously.

In an effort to overcome this problem, the government argues that, unlike in this case, no evidence of the occurrence of bombings was offered or was needed to convict in the previous trials.[151] That is certainly true.[152] But, as we have seen, the proof as to the responsibility of these defendants for these acts will be the same proof as was used in the earlier trials.

Thus, the question before the Court [153] is whether the Double Jeopardy Clause is violated if, at two successive trials involving the same defendants, the evidence that will be used in the second trial is necessarily [154] identical to that which was used to convict these defendants in the first trial. Can the government relitigate previous trials, *in their entirety*, witness by witness, document by document, for weeks or months, in order to convict defendants of conduct that is different in name but not otherwise?

### D. *Decisions Enlarging Upon Blockburger*

As indicated *supra*, refinements of *Blockburger* have emerged in the last fifty years that do not make the answer to the double jeopardy question depend solely upon the more or less technical circumstance that one of the offenses contains an element that the other does not.

The Supreme Court recognized some time after *Blockburger* that the standards of that decision do not necessarily suffice to protect the defendant from double jeopardy in successive prosecutions. As the Court said in *Brown v. Ohio*, 432 U.S. 161, 166 n. 6, 97 S.Ct. 2221, 2225 n. 6, 53 L.Ed.2d 187 (1977):

> The *Blockburger* test is not the only standard for determining whether successive prosecutions impermissibly involve the same offense. Even if two offenses are sufficiently different to per-

---

**150.** One of the problems—probably insurmountable given the evidence available to the government—is that the significant charges are so indirect and amorphous in three respects: (1) conspiracies both in the earlier trials and now; (2) proof of the current conspiracy will not include any direct evidence of participation by these three defendants in bombing acts; and (3) proof will be based on an aider and abettor theory, again lacking any element of direct participation of these defendants, with regard to the current substantive charges. Although technically different, aiding and abetting bombings and a conspiracy to bomb become virtually indistinguishable in this case because of the government's plan—an inevitable plan, given the evidence—to establish the aiding and abetting charges by proving defendants' involvement in the conspiracy. Government Opposition at 17–18. It is because of this amorphousness that the same evidence can be used to support every one of these charges even though technically they are all different.

**151.** Government's Opposition at 8 n. 2.

**152.** Actually, as noted *supra*, bombing evidence in the form of letters from the defendant indicating an intention to bomb or a claim of responsibility for bombings was introduced in Berkman's previous trial. Likewise, there was such evidence in the Blunk–Rosenberg trial in the form of blasting caps.

**153.** Defendants also raise other questions. Thus, they also rely on the doctrine of collateral estoppel (arising from the fact that the Berkman jury did not check off all the overt acts charged against the defendant on the verdict sheet) and on an alleged violation by the prosecution of the policy in *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960). These contentions lack merit. Since in order to convict the jury needed to find only a single overt act, its failure to check off all the overt acts cannot be regarded as an acquittal cognizable here as collateral estoppel. This is particularly true since the jury did not check off overt acts involving weapons possession, but at the same time convicted Berkman of nine substantive weapons and explosives offenses. As for the *Petite* policy, it is an internal Justice Department matter and cannot be imported into the court system under the rubric of due process.

**154.** The government will "necessarily" rely on the same evidence because it has no other evidence of the involvement of these defendants in these crimes.

mit the imposition of consecutive sentences, successive prosecutions will be barred in some circumstances *where the second prosecution requires the relitigation of factual issues already resolved by the first* (emphasis added).

Developing alongside *Blockburger*, therefore, is a line of cases based not on the rigid statutory elements of the two crimes but on the evidence actually used and to be used in proving the defendant's involvement in the offenses. According to these decisions, the test—actually foreshadowed before *Blockburger* was handed down—is whether "the evidence required to warrant a conviction upon one of the [prosecutions] would have been sufficient to support a conviction on the other." *In re Nielsen*, 131 U.S. 176, 188, 9 S.Ct. 672, 676, 33 L.Ed. 118 (1889); [155] *see also, Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977); *Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Thompson v. Oklahoma*, 429 U.S. 1053, 97 S.Ct. 768, 50 L.Ed. 2d 770 (1977) (Brennan, J., dissenting from denial of certiorari).[156]

This principle has been most often applied in the lesser-included offense cases. In such cases it has consistently been held that the Double Jeopardy Clause bars a successive trial for an offense that would necessarily have been established by the facts required to establish guilt on the first offense. *See Harris v. Oklahoma, supra* (defendant may not be tried for robbery with firearms following his conviction of felony murder because that conviction necessarily required proof of a felony (robbery) with firearms); *Brown v. Ohio, supra* (defendants could not be tried for greater offense of auto theft following con-

viction of lesser-included offense of joyriding); *Jordan v. Virginia*, 653 F.2d 870, 873 (4th Cir.1980) (defendants could not be tried for felony offense of possession of a controlled substance following conviction of misdemeanor offense of obtaining a drug with a forged prescription); *United States v. Sabella*, 272 F.2d 206, 211 (2d Cir.1959) (defendant could not be convicted of selling illegally imported heroin following conviction for selling heroin without a written order).

While this case does not involve a lesser-included offense, analytically there is no difference between that group of cases and the present one. In both instances (1) the evidence in the first trial is the same as that used in the second trial, (2) the evidence is necessarily identical, for at the second trial the offenses could not be proved without use of that evidence, and (3) thus one trial involves relitigation of the other trial in full.

Accordingly, the *Brown* rationale has not been limited to the lesser included offense category, and the commentators have likewise concluded that it cannot logically be so limited. Westin and Drubel, 1978 Sup. Ct.Rev. 81, 162–63 (1978). To be sure, outside the lesser included offense group there are not many precedents in this field, first, because it is more difficult to determine whether the factual predicate for application of the rule exists, and second, because the rule requires a rather unusual confluence of procedural and factual circumstances. However, where, as here, a core of evidence common to the two successive prosecutions exists, the answer is clear. Indeed, *Brown* does not stand alone.

---

**155.** In that case, the defendant was first tried and convicted of cohabitation, and he was subsequently tried and convicted of adultery, based on the same facts and evidence. The Court reversed the second conviction on the ground that the "material part of the adultery charge was comprised within the unlawful cohabitation of which the petitioner was already convicted [for where] a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice

put in jeopardy for the same offense." 131 U.S. at 187–88, 9 S.Ct. at 675–76.

**156.** The *Blockburger* analysis is most readily displaced where the issue is whether two conspiracies are the same, as distinguished from the question whether a single act violates two distinct statutes. *United States v. Phillips*, 664 F.2d 971, 1006 (5th Cir.1981); *United States v. Tercero*, 580 F.2d 312, 315 (8th Cir.1978); *United States v. Mallah*, 503 F.2d 971, 985 (2d Cir.1974); *United States v. Mayo*, 646 F.2d 369, 372 (9th Cir.1981).

Particularly noteworthy in this regard is the *Vitale* case, where the Supreme Court considered whether the crimes of manslaughter by automobile and failure to reduce speed to avoid an accident were separate and distinct crimes for double jeopardy purposes. The defendant had already been convicted of failure to reduce speed. The Court observed that the primary consideration was whether the statutory elements required to prove one offense necessarily proved the other. On that basis, it concluded that failure to reduce speed was not necessarily a lesser-included offense of manslaughter by automobile because manslaughter could be proven by showing recklessness other than failure to slow, and it therefore remanded the case to the Illinois Supreme Court to determine the relationship between the two offenses under Illinois law. However, the Court went on to note that

> ... it may be that to sustain its manslaughter case the State may find it necessary to prove a failure to slow or to rely on conduct necessarily involving such failure; it may concede as much prior to trial. In that case, because Vitale has already been convicted for conduct that is a necessary element of the more serious crime for which he has been charged, his claim of double jeopardy would be substantial....

447 U.S. at 420, 100 S.Ct. at 2267. This standard is described as the same-actual-evidence test by various commentators and courts. *See, e.g., United States v. Allen*, 539 F.Supp. 296, 310 (C.D.Cal.1982); Note, *Multiple Prosecutions and Punishments Under RICO: A Chip Off the Old "Blockburger"*, 52 U.Cinn.L.R. 467, 484 (1983).

The situation envisioned by the Court in *Vitale* is precisely the factual situation in this case. In order to establish the culpability of these three defendants of the substantive bombing charges, the government must prove the earlier conspiracies which it already proved once before, and ask the jury to infer that culpability under an aiding and abetting theory.[157] Without those conspiracies, there would be nothing to link the defendants to the substantive offenses. But the point of the *Brown* line of cases, and particularly of the same-actual-evidence language in *Vitale*, is precisely that it is not enough simply to relabel the offense; a defendant cannot be tried again for what amounts to the same conduct.

*Pinkerton v. United States*, 328 U.S. at 643–44, 66 S.Ct. at 1182, upon which the government relies,[158] actually deals with a different issue and is therefore not dispositive. In that case the Court held that the Double Jeopardy Clause does not bar charging a defendant with both a conspiracy and an underlying substantive act. Because the charges at issue in *Pinkerton* were all brought in one trial, however, the inquiry was whether multiple sentences may be imposed for violation of conspiracy and substantive statutes in a single trial, and that question could appropriately be answered, in conformity with the legislative intent, in the affirmative, even if the involvement in the substantive act was shown only by involvement in the conspiracy. By contrast, where there is a second trial, what governs is the constitutional policy of finality underlying the Double Jeopardy Clause which protects the defendant from successive trials and the repetition of burdens of trial process itself. *See Brown v. Ohio, supra*, 432 U.S. at 165–66, 97 S.Ct. at 2225; *Jordan*, 653 F.2d at 873; *United States v. Sabella*, 272 F.2d 206, 211–12 (2d Cir.1959); Note, *Twice in Jeopardy*, 75 Yale L.J. 262, 267, 277–79, 302 (1965).[159]

---

**157.** Alternatively, the government might rely on *Pinkerton v. United States, supra*, which held that where a defendant is tried for a conspiracy and a related substantive offense, the jury can be instructed that even if there is no direct evidence of the defendant's involvement in the substantive offense, guilt can be inferred from involvement in the conspiracy. This part of the *Pinkerton* holding is not concerned with the issue of double jeopardy.

The fact that the government has stated that it may seek a *Pinkerton* charge highlights the central importance of the conspiracy to the proof of the substantive acts.

**158.** Government Opposition at 7.

**159.** *See also, Pacelli v. United States*, 588 F.2d 360, 364 (2d Cir.1978), where the court recognized that the prejudice to a defendant from the joinder of a double jeopardy-barred conspiracy

None of this is to suggest that the government may not convict a defendant of a conspiracy and of an underlying overt act constituting a substantive offense, even in successive trials. It may. *United States v. Hinton*, 543 F.2d 1002, 1014 (2d Cir. 1976). But in the normal case, there is some direct evidence of the defendant's involvement in that substantive offense. *Id.; see also, United States v. Marakar*, 300 F.2d 513 (3d Cir.1962), *cert. granted*, 370 U.S. 723, 82 S.Ct. 1573, 8 L.Ed.2d 803, and judgment vacated and indictment dismissed at the request of the Solicitor General. The problem arises when a defendant is tried in successive trials for a conspiracy and a substantive act *and* the proof of his involvement in the substantive act is identical, or nearly identical [160] to that previously used to prove an earlier conspiracy, and necessarily so. In such a case, the Double Jeopardy Clause, as it is delineated in *Brown* and *Vitale*, must protect the defendant from being forced to endure relitigation of his previous trial.

One decision that is fairly close to this case on the facts is *United States v. Allen*, 539 F.Supp. 296 (C.D.Cal.1982). In that case, the defendants were tried for conspiracy and mail fraud, and one was convicted, the other acquitted. A new indictment was returned, charging both again with conspiracy and mail fraud, the government claiming that it now had different and stronger facts. Applying an actual-evidence analysis similar to that required here, the court stated that double jeopardy precluded trial of both defendants for the new substantive acts because

> ... the evidence required to prove the new substantive counts would, of necessity, reprove the conspiracy count al-

ready prosecuted. Consequently, the actual-evidence test mandates that, at least on the facts of this case, the conspiracy count and the substantive counts be tried simultaneously. It follows that since defendants have already been prosecuted for the conspiracy, they cannot be tried on the mail fraud counts.

*Allen, supra*, 539 F.Supp. at 311.

This case, like *Allen*, is one of those presumably rare cases in which the government prosecutes a defendant for conspiracy and substantive offenses in successive trials and is forced to reprove the conspiracy in order to establish defendant's guilt for aiding and abetting the substantive offense.[161] As in *Allen*, "the evidence required to prove the new substantive counts would, of necessity, reprove the conspiracy count already prosecuted." *Allen, supra*, 539 F.Supp. at 310.

### E. *Purpose of Prohibition on Double Jeopardy*

For a full understanding of the post-*Blockburger* decisions which focus on the evidence rather than on the elements of the offense, it is important to look also beyond analogy to the purpose of the prohibition on double jeopardy. "The general function of the double jeopardy clause is to assure that the prosecution and punishment of an individual have the degrees of finality and fairness essential to administration of the criminal law." Note, *A Definition of Punishment for Implementing the Double Jeopardy Clause's Multiple–Punishment Prohibition*, 90 Yale L.J. 632, 634 (1981). More directly, according to the Supreme Court:

---

charge to substantive counts in an indictment and the giving of a *Pinkerton* charge, such as the government expects to request here (*see* note 157, *supra*), raises serious constitutional questions.

**160.** The prosecution could not avoid the impact of the same-evidence double jeopardy rule simply by adding proof at the second trial that is more or less gratuitous or cumulative and does not effect a significant change in the evidence actually necessary to convict.

**161.** In most cases, the government has direct evidence of a defendant's involvement in substantive acts. For example, a defendant who is convicted of a narcotics conspiracy is often later tried for the substantive acts of drug possession. Proof of these acts, however, generally consists of evidence that on a certain day the defendant was arrested while in possession of a certain quantity of drugs. In such a case, there is no need to relitigate the entire conspiracy in order to prove the defendant's involvement in the substantive act.

The constitutional prohibition against double jeopardy was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 223, 2 L.Ed.2d 199 (1957); *see also, Jordan,* 653 F.2d at 873 ("Basically it insures that having once 'run the gauntlet' of criminal trial to judgment either of conviction or acquittal, a person shall not be required to run essentially the same gauntlet again").[162]

All three of these defendants have endured long trials in which they have defended against government allegations of conspiracy and possessing weapons and explosives and possessing false identification. Having been convicted of these crimes, all of them are now serving long sentences of imprisonment.[163] In the four years since they were arrested, they have no doubt exhausted what resources they had, as well as much of their energy, in defending against these prior conspiracy charges.

These same defendants must now defend themselves again in this Court. While the formal charges are new, the actual charges are not. The issue at the trial of this case will not be whether Berkman, Blunk, or Rosenberg were seen at the scene of the United States Capitol or the other three buildings that were bombed on the days of the bombings. There is no such evidence. Instead, once again, as before, the trial will necessarily revolve around such issues as whether Berkman transported weapons to Doylestown, Pennsylvania on May 23, 1985 and whether Blunk and Rosenberg pos-

sessed 199 sticks of Hercules Unigel Tamptite Dynamite on November 29, 1984—in short, whether the defendants were involved in the very conspiracies for which they have already been tried and convicted.

At bottom, the situation is this: if the government's theory is correct, it can charge the defendants with specified substantive acts; it can prove those acts by showing involvement in a conspiracy to commit those acts; it can prove the conspiracy by the same evidence that it used in a prior conspiracy trial;[164] and the defendants cannot, in practice, defend against the allegedly different conspiracy because they had already been convicted of participation in the prior conspiracy.

Conceptually, and perhaps in practice, there may well be no end to this. Government counsel conceded at the motions hearing that there would be no double jeopardy barrier to the bringing of yet new charges against these defendants on the basis of the same conspiracy evidence after the current charges are disposed of by trial and verdict. Under the government's theory, the same explosives, papers, and other tangible evidence that were used to prove defendants' guilt in the Philadelphia and New Jersey prosecutions, and that are expected by the government to prove their guilt here, could then validly become the foundation of a subsequent conviction in, say, the Eastern District of New York for the Staten Island bombing. All it would take to achieve that result would be circumstantial evidence of defendants' involvement (*i.e.,* their possession of explosives, papers, and other tangible evidence)

**162.** The Department of Justice has itself recognized that "considerations of fairness to defendants and of efficient and orderly law enforcement" dictate that a defendant be tried in a single trial for offenses arising out of the same transaction. *Petite v. United States,* 361 U.S. 529, 530, 80 S.Ct. 450, 451, 4 L.Ed.2d 490 (1960). While this is an internal Department policy, and is not binding precedent (*see* note 153, *supra* ), and while the Department staunchly maintains that it is not motivated by double jeopardy concerns, these "fairness" considerations have led the Department to request dismissal of the indictment in cases factually similar to this one in which double jeopardy was the only issue on appeal. *Id.; see also,* the history of *United*

*States v. Marakar, supra,* where the judgment was vacated and the indictment dismissed following the grant of certiorari at the request of the Solicitor General.

**163.** The appeals from these convictions have been exhausted; thus, the possibility of reversal no longer exists.

**164.** The Double Jeopardy Clause also prevents the government from subdividing a single criminal conspiracy into multiple violations of one conspiracy statute. *Braverman v. United States,* 317 U.S. 49, 52–53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942).

augmented by nothing more than proof of their association with another individual against whom there is likewise only circumstantial evidence (*e.g.,* the possession of letters indicating a purpose to bomb the Federal Building on Staten Island).

Such prosecution could be multiplied almost ad infinitum,[165] especially as these prosecutions would be brought against the members of various extremist groups who appear to be frequently in contact with one another. Conviction in any subsequent trial would validly be sustained if based on possession by any defendant of the same weapons, explosives, and identification papers as long as he was connected in each successive prosecution with a different codefendant who could be tied to a different bombing, albeit also only circumstantially. It is such filing of successive charges, of successive trials, and of successive convictions based essentially on the same proof, that the Double Jeopardy Clause in its most profound sense was designed to prevent.[166] *See Abbate,* 359 U.S. 187, 200, 79 S.Ct. 666, 673, 3 L.Ed.2d 729 (Brennan, J., concurring); *Green,* 355 U.S. at 187–88, 78 S.Ct. at 223. As the court said in *Allen:*

> if the [double jeopardy] ban were not invoked, a seemingly endless series of prosecutions would be possible, forcing the defendant to live in a continuing state of insecurity and anxiety from one trial to the next, not knowing which trial will be his last.

*United States v. Allen,* 539 F.Supp. at 321.

The principle that no individual shall be twice placed in jeopardy—the most ancient of the procedural guarantees in the Bill of Rights[167]—is in essence a rule of fairness. It is simply not fair to subject anyone—adulterer, burglar, or terrorist—to several successive prosecutions based on the same course of conduct and the same evidence. The government has previously secured convictions of these defendants resulting in sentences of 58 years (Blunk), 58 years (Rosenberg), and 12 years (Berkman),[168] respectively. Under our constitutional system—the system that defendants apparently hate and wish to overthrow[169]—the government is precluded from securing additional convictions by use of the same evidence that was the basis of the earlier convictions.

The motion of Blunk, Rosenberg, and Berkman to dismiss the charges against them as being violative of the Double Jeopardy Clause of the United States Constitution will be granted.

---

165. The bombing of the South African consulate in Manhattan could be next, and after that the Israeli Aircraft Industries Building there, or the Patrolmen's Benevolent Association Building.

166. This does not mean, of course, that if after a first, second, or third prosecution the government was able to produce evidence that the defendant participated directly in another offense (*e.g.,* the Staten Island bombing) he could not be convicted of that crime notwithstanding his prior prosecutions and convictions. It is the use of the same evidence over and over again that is the vice.

167. The roots of the Double Jeopardy Clause reach as far back as Demosthenes ("the laws forbid the same man to be tried twice on the same issue"). Demosthenes 589 (Vance transl. 1962), quoted in *United States v. Jenkins,* 490 F.2d 868, 870 (2d Cir.1973), *aff'd,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975). It consti-

tutes "one of the oldest ideas found in western civilization," *Bartkus v. Illinois,* 359 U.S. 121, 151, 79 S.Ct. 676, 695, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). *See also,* 4 Blackstone, Commentaries *335 ("[It is a] universal maxim of the common law of England, that no man is to be brought into jeopardy of his life, more than once for the same offense"); *Ex Parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873).

168. As noted above, only ten of these years are directly attributable to that defendant's Philadelphia trial.

169. *See, e.g.,* Defendants' Motion to Dismiss the Indictment for Governmental Misconduct at 2: "These defendants are revolutionaries. They don't believe that the system can be reformed fundamentally at this point. There is too much power at stake. People should not be 'given' their rights. People have to take them."